# SCINDIA STEAM NAVIGATION CO., LTD. *v.* DE LOS SANTOS ET AL.

No. 79–512.   Argued December 1, 1980—Decided April 21, 1981

WHITE, J., delivered the opinion of the Court, in which all other Members joined except BURGER, C. J., who took no part in the decision of the case. BRENNAN, J., filed a concurring opinion, in which MARSHALL and BLACKMUN, JJ., joined, *post*, p. 179. POWELL, J., filed a concurring opinion, in which REHNQUIST, J., joined, *post*, p. 180.

*Graydon S. Staring* argued the cause for petitioner. With him on the briefs was *Robert H. Madden.*

*James A. Grutz* argued the cause for respondents and filed a brief for respondent De Los Santos.*

JUSTICE WHITE delivered the opinion of the Court.

Respondent Santos, a longshoreman and an employee of respondent Seattle Stevedore Co., was injured while he was helping load the M/S *Jalaratna,* a vessel owned by petitioner Scindia Steam Navigation Co., Ltd. He later brought an action against Scindia pursuant to § 5 (b) of the Longshoremen's and Harbor Workers' Compensation Act (Act), as amended in 1972,[1] which, as set forth in 33 U. S. C. § 905 (b), provides in relevant part as follows:

> "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary

---

*Harry M. Philo, Arthur Roth,* and *Nathan Baker* filed a brief for the Association of Trial Lawyers of America as *amicus curiae* urging affirmance.

*E. D. Vickery* filed a brief for Apex Marine Corp. et al. as *amici curiae.*

[1] Pub. L. 92–576, 86 Stat. 1251, amending 33 U. S. C. §§ 901–950.

shall be void. . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter." [2]

The District Court granted petitioner's motion for summary judgment; [3] the Court of Appeals, disagreeing with the District Court on both the facts and the law, reversed and remanded for further proceedings. 598 F. 2d 480 (CA9 1979). We granted certiorari, 446 U. S. 934, because the Courts of Appeals are in considerable disagreement as to the meaning and application of § 905 (b). [4]

I

For present purposes, we take the facts from the opinion of the Court of Appeals, which properly viewed the case in the light most favorable to Santos, against whom summary judgment had been granted.

On December 10, 1972, Seattle Stevedore Co., pursuant to its undertaking with Scindia, was engaged in loading a cargo of wheat into a hold of the M/S *Jalaratna*. A winch, part of the ship's gear, was being used to lower wooden pallets, each containing seventy 50-pound sacks of wheat, into the hold. Because of the location of the winch controls, the longshoreman operator relied on the hatch tender, another long-

---

[2] Section 933, referred to in § 905 (b), among other things provides that an injured longshoreman need not elect between compensation and suing a third party. It also specifies the relative rights of the longshoreman and his employer where the longshoreman accepts compensation and sues a third party or fails to do so within a specified time. Because its compensation payments to Santos gave it an interest in Santos' recovery, Seattle Stevedore Co. intervened and is a respondent here.

[3] The District Court's opinion is reported at 1976 A. M. C. 2583 and is Appendix A to the petition for certiorari.

[4] See n. 9, *infra*.

shoreman, to signal him when to start and stop the winch while lowering a pallet of sacks into the hold. Santos and three other longshoremen were in the hold. Their task was to remove sacks of wheat from the pallet and properly stow them.

On the day of the accident, as it had for the two previous days, the braking mechanism of the winch was malfunctioning in that it would not quickly stop the descent of a loaded pallet, which would continue to drop for several feet before coming to a stop. At the time important here, while a pallet was being lowered, the hatch tender signaled the winch operator to stop the descent of the load. The brake was applied, but the pallet did not stop before striking a pallet jack [5] with some force and spilling about half the sacks of wheat from the pallet. The hatch tender signaled the operator to raise the pallet about 15 feet and, believing that the remaining sacks on the pallet were secure enough not to fall, permitted Santos and the other men to clear away the spilled sacks then lying below in the hold. Some minutes later, however, more sacks fell from the pallet, striking and injuring Santos. There was dispute as to whether the additional sacks fell because the suspended pallet was swinging back and forth or because while the pallet was suspended the braking mechanism slipped on three or four occasions, each time requiring the operator to raise it again, thus working loose the additional sacks that fell on Santos.

Relying on the legislative history of the 1972 Amendments to the Act, the District Court held that the negligence standards governing the longshoreman's action against a shipowner under § 905 (b) are best expressed in Restatement (Second) of Torts §§ 343 and 343A (1965), which purport to

---

[5] A pallet jack is a small, wheeled, cartlike vehicle with prongs on the front like a forklift with which the longshoremen in the hold would cart the pallet load to the wings of the hold where they would then remove the sacks and stow them by hand. Record 77.

state the prevailing or preferred rules governing the liability of a possessor of land to an invitee.[6] Under these land-based negligence standards, the District Court thought

> "a shipowner is not liable for dangerous conditions created by the stevedore's negligence while the stevedore [is] in exclusive control over the manner and area of the work . . . , nor is the shipowner under a duty to warn the stevedore or his employees of dangers or open and obvious defects which are known to the stevedore or his employees or which are so obvious and apparent that they may reasonably be expected to discover them." 1976 A. M. C. 2583, 2585.

Based on the admissions of the parties and the depositions available to the court, the District Court concluded (1) that there was no dispute that the premises were in the exclusive control of Seattle during the loading operation and (2) that

---

[6] Restatement (Second) of Torts § 343 provides:

"§ 343. Dangerous Conditions Known to or Discoverable by Possessor

"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

"(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

"(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

"(c) fails to exercise reasonable care to protect them against the danger."

Restatement (Second) of Torts § 343A provides:

"§ 343A. Known or Obvious Dangers

"(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

"(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated."

even if Scindia knew or should have known of the defective winch,[7] the condition of the winch "was open and obvious to the plaintiff" and "the fact that plaintiff undertook his actions free from any direction by the defendant while recognizing that the circumstances were so dangerous, is such that the defendant cannot be held liable as a matter of law." *Id.*, at 2586–2587. In addition, the District Court found that "the alleged defective condition of the winch had only a remote cause-of-fact relationship to plaintiff's accident and could not have been the proximate cause thereof as a matter of law." *Id.*, at 2587. Hence, summary judgment was granted.[8]

Reversing, the Court of Appeals disagreed with the District Court and with other Courts of Appeals with respect to the applicable law. Sections 343 and 343A of the Restatement were improper measures of the shipowner's liability for negligence under § 905 (b) [9] because those sections in effect

---

[7] The District Court stated, 1976 A. M. C., at 2586, that "[p]laintiff does not controvert defendant's claim that no one from the ship's crew was ever informed of the winch's condition prior to the accident" and further stated that if the winch was defective, it was a "condition [about] which the Court finds the shipowner did not know nor should it reasonably have been expected to know, given the exclusive control of the gear by the stevedores during the relevant time period." *Ibid.* Scindia contended in any event that the winch was not defective but concedes that for present purposes the case should be judged on the assumption that it was.

[8] Federal Rule of Civil Procedure 56 (c) provides that judgment shall be entered in favor of the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

[9] The Court of Appeals acknowledged that the Courts of Appeals for the Second, Fourth, and Fifth Circuits had relied on these sections in § 905 (b) suits. See, *e. g.*, *Canizzo* v. *Farrell Lines, Inc.*, 579 F. 2d 682 (CA2 1978); *Gay* v. *Ocean Transport & Trading, Ltd.*, 546 F. 2d 1233 (CA5 1977); *Anuszewski* v. *Dynamic Mariners Corp., Panama*, 540 F. 2d 757 (CA4 1976); *Napoli* v. *Hellenic Lines, Ltd.*, 536 F. 2d 505 (CA2 1976). The Court of Appeals for the Second Circuit has recently reaffirmed its position. *Evans* v. *S.S. "Campeche,"* 639 F. 2d 848 (1981). On the other

incorporated notions of contributory negligence and assumption of risk that were inapplicable under the maritime law. Instead, the Court of Appeals declared the controlling standard under § 905 (b) to be the following:

> "A vessel is subject to liability for injuries to longshoremen working on or near the vessel caused by conditions on the vessel if, but only if, the shipowner
>
> "(a) knows of, or by the exercise of reasonable care would discover, the condition, and should realize that it involves an unreasonable risk of harm to such longshoremen, and
>
> "(b) the shipowner fails to exercise reasonable care under the circumstances to protect the longshoremen against the danger." 598 F. 2d, at 485.

Under this standard, Scindia's duty to inspect did not end even if the vessel was turned over to the stevedore in safe condition. If conditions dangerous to the longshoremen subsequently developed, in light of the vessel's practical opportunities to discover the dangers and remedy them, failure to do so could be negligence on its part.[10]

---

hand, the First and Third Circuits, like the Ninth Circuit, have held that these sections should not apply in § 905 (b) suits since they might bar a longshoreman from recovery because he was contributorily negligent or because he voluntarily encountered a known or obvious risk. See *Sarauw* v. *Oceanic Navigation Corp.*, 622 F. 2d 1168 (CA3 1980); *Johnson* v. *A/S Ivarans Rederi*, 613 F. 2d 334 (CA1 1980); *Griffith* v. *Wheeling Pittsburgh Steel Corp.*, 610 F. 2d 116 (CA3 1979); *Lawson* v. *United States*, 605 F. 2d 448 (CA9 1979); *Bachtel* v. *Mammoth Bulk Carriers, Ltd.*, 605 F. 2d 438 (CA9 1979); 598 F. 2d 480 (CA9 1979) (case below).

[10] The Court of Appeals referred to its standard as being a "reasonable care under the circumstances" approach. *Id.*, at 486. It found support for this formulation in *Kermarec* v. *Compagnie Generale Transatlantique*, 358 U. S. 625 (1959). In that case, a visitor paying a social call on a member of the ship's crew was injured when he fell on a defective stairway. The jury found the shipowner negligent and returned a verdict, which was set aside on appeal because the visitor had been a

Under the Court of Appeals' view of the law there were several material facts in dispute that were for a jury to resolve: whether the shipowner knew or should have known of the defective winch; whether Seattle was in exclusive control of the loading in the sense that only Seattle could have repaired the winch; whether the defective operation of the winch had caused the initial spillage of the sacks, thus necessitating a cleanup, or had later been the proximate cause of the additional sacks falling from the pallet and injuring Santos. Accordingly, the Court of Appeals set aside the judgment of the District Court and remanded for further proceedings.

## II

Initially, we must briefly revisit the 1972 Amendments to the Act. Prior to 1972, a longshoreman injured while loading or unloading a ship could receive compensation payments and also have judgment against the shipowner if the injury was caused by the ship's unseaworthiness or negligence. *Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85 (1946). Proof of unseaworthiness required no proof of fault on the part of the shipowner other than an unsafe, injury-causing condition on the vessel. This was true even though the condition was

---

licensee rather than an invitee. This Court reversed, preferring to adopt a single duty of "exercising reasonable care under the circumstances of each case," rather than to incorporate in the maritime law the complexities of the common law of invitee and licensee. *Id.,* at 632. The *Kermarec* standard was reaffirmed in *Marine Terminals* v. *Burnside Shipping Co.,* 394 U. S. 404 (1969), a case involving a suit by a stevedore against the shipowner. We have no quarrel with this standard. Inevitably, however, the rule will undergo refinement as it is applied to various categories of cases. Thus, in considering the reasonableness of Scindia's conduct under this standard, the Court of Appeals found it appropriate to inquire whether the shipowner had a continuing duty to inspect and held that it did. As will become evident, we have a different view: the shipowner's duty of reasonable care under the circumstances does not impose a continuing duty to inspect the cargo operations once the stevedore begins its work.

caused, created, or brought into play by the stevedore or its employees.[11] In the latter event, the shipowner could recover over against a stevedore for breach of express or implied warranty to handle the cargo in a reasonably safe manner. *Ryan Stevedoring Co.* v. *Pan-Atlantic S.S. Corp.,* 350 U. S. 124 (1956).[12]

The 1972 Amendments, particularly by adding § 905 (b), radically changed this scheme of things. The compensation payments due the longshoreman from the stevedore for injuries incurred in the course of his employment were substantially increased; the longshoreman's right to recover for unseaworthiness was abolished; his right to recover from the shipowner for negligence was preserved in § 905 (b), which provided a statutory negligence action against the ship; and the stevedore's obligation to indemnify the shipowner if the latter was held liable to the longshoreman was abolished.

Section 905 (b) did not specify the acts or omissions of the vessel that would constitute negligence. In light of the differences among the lower federal courts as to the construction and application of § 905 (b), neither can it be said that the legislative history, which has been analyzed and reanalyzed in the course of these cases, furnishes sure guidance for construing § 905 (b).[13] Much was left to be resolved through

---

[11] *Alaska S.S. Co.* v. *Petterson,* 347 U. S. 396 (1954); *Weyerhaeuser S.S. Co.* v. *Nacirema Operating Co.,* 355 U. S. 563 (1958); *Crumady* v. *The J. H. Fisser,* 358 U. S. 423 (1959); *Waterman S.S. Corp.* v. *Dugan & McNamara, Inc.,* 364 U. S. 421 (1960); *Italia Societa* v. *Oregon Stevedoring Co.,* 376 U. S. 315 (1964).

In *Usner* v. *Luckenbach Overseas Corp.,* 400 U. S. 494 (1971), however, we ruled that a single act of operational negligence by the stevedore did not render the vessel unseaworthy or subject the vessel to liability.

[12] See also the cases cited in n. 11, *supra.*

[13] Section 905 (b) itself negates the vessel's liability for unseaworthiness, and the Committee Reports state that the purpose of eliminating this remedy was to place the injured longshoreman "in the same position he would be if he were injured in non-maritime employment ashore . . . and not to endow him with any special maritime theory of liability or cause of

the "application of accepted principles of tort law and the ordinary process of litigation." Rep., p. 11.

## III

We held in *Marine Terminals* v. *Burnside Shipping Co.*, 394 U. S. 404, 415 (1969), that the vessel owes to the stevedore and his longshoremen employees the duty of exercising due care "under the circumstances." This duty extends at

---

action under whatever judicial nomenclature it may be called, such as 'unseaworthiness', 'non-delegable duty', or the like." S. Rep. No. 92–1125, p. 10 (1972) (hereafter Rep.). (H. R. Rep. No. 92–1441 (1972) is in all relevant respects identical to the Senate Report.) The vessel was not to be liable on the theory of unseaworthiness for the acts or omissions of stevedores, or of the employees of stevedores, for the manner in which the stevedore performed its work, or for its defective gear or equipment. Rep., p. 10. Its liability was to be "based on its own negligence" and could be proved only if it was shown "to have acted or have failed to act in a negligent manner such as would render a land-based third party in non-maritime pursuits liable under similar circumstances." *Id.*, at 11.

At the same time, the Committees observed that the statutory cause of action for negligence would "meet the objective of encouraging safety because the vessel would still be required to exercise the same care as a land-based person in providing a safe place to work." *Id.*, at 10. Nothing was intended "to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition" as long as the vessel was not "chargeable with the negligence of the stevedore or employees of the stevedore." *Id.*, at 10, 11.

The Committees also anticipated that in § 905 (b) cases, as in other admiralty cases, the rule of comparative negligence would apply and the defense of assumption of risk would be barred. Furthermore, the Reports emphasized that the amendments were not intended to relieve any person from his duties and obligations under the Occupational Safety and Health Act of 1970.

Otherwise, the definition of the vessel's negligence and its resulting liability were left to be "resolved through the application of accepted principles of tort law and the ordinary process of litigation—just as they are in cases involving alleged negligence by land-based third parties." Rep., p. 11. It was anticipated, however, that questions arising in § 905 (b) cases "shall be determined as a matter of Federal law." Rep., p. 12.

least to exercising ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work. *Id.*, at 416, n. 18. The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools, and work space to be used in the stevedoring operations; and if he fails at least to warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshoreman. Petitioner concedes as much. Brief for Petitioner 20–21. It is also accepted that the vessel may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation.

The parties, however, like the District Court and the Court of Appeals, are in sharp disagreement as to the vessel's duty under § 905 (b) once the stevedore's cargo operations have begun. Scindia contends that the shipowner has no duty to supervise or inspect the stevedore's cargo operations or to take reasonable care to discover dangerous conditions that develop or come to light during the loading or unloading. Scindia also submits that even if the vessel learns of the hazard, it has no duty to correct it and is entitled as a matter of law to rely on the stevedore to protect his employees from injury. This is true, Scindia argues, even though the hazard is an ob-

viously defective ship's winch being used by the stevedore and his longshoremen employees,[14] and even if the winch was defective when the stevedore came aboard and the vessel is charged with knowledge of the condition. Respondents, on the other hand, defend the view of the Court of Appeals that the vessel is subject to a continuing duty to use reasonable care to discover dangerous conditions exposing longshoremen to unreasonable risk of harm and to exercise reasonable care under the circumstances to protect them. We are unable to agree wholly with either of these submissions.

Considering first the position of the Court of Appeals, we cannot agree that the vessel's duty to the longshoreman requires the shipowner to inspect or supervise the stevedoring operation. Congress intended to make the vessel answerable for its own negligence and to terminate its automatic, faultless responsibility for conditions caused by the negligence or other defaults of the stevedore. Cases holding the vessel liable on the ground that it owed nondelegable duties to protect the longshoremen from injury were rejected.[15] It would

---

[14] Because the legislative history suggests that the shipowner's liability is to be judged by land-based standards, see n. 13, *supra,* it is urged that the District Court properly turned to and applied §§ 343 and 343A of the Restatement (Second) of Torts. But the legislative history does not refer to the Restatement and also states that land-based principles of assumption of risk and contributory negligence are not to be applied in § 905 (b) cases. This strongly suggests, as *Kermarec* v. *Compagnie Generale Transatlantique,* 358 U. S. 625 (1959), indicated, that maritime negligence actions are not necessarily to be governed by principles applicable in nonmaritime contexts. Furthermore, since the lower courts are in disagreement not only as to the applicability of §§ 343 and 343A but also as to their import and meaning when applied in the maritime context, those sections, while not irrelevant, do not furnish sure guidance in cases such as this.

[15] "Thus a vessel shall not be liable in damages for acts or omissions of stevedores or employees of stevedores subject to this Act. *Crumedy* vs. *The J. H. Fisser,* 358 U. S. 423, *Albanese* vs. *Matts,* 382 U. S. 283, *Skibinski* vs. *Waterman SS Corp.,* [360] F. 2d 539; for the manner or method in which stevedores or employees of stevedores subject to this

be inconsistent with the Act to hold, nevertheless, that the shipowner has a continuing duty to take reasonable steps to discover and correct dangerous conditions that develop during the loading or unloading process. Such an approach would repeatedly result in holding the shipowner solely liable for conditions that are attributable to the stevedore, rather than the ship. True, the liability would be cast in terms of negligence rather than unseaworthiness, but the result would be much the same. "[C]reation of a shipowner's duty to oversee the stevedore's activity and insure the safety of longshoremen would . . . saddle the shipowner with precisely the sort of nondelegable duty that Congress sought to eliminate by amending section 905 (b)." *Hurst* v. *Triad Shipping Co.*, 554 F. 2d 1237, 1249–1250, n. 35 (CA3 1977); *Evans* v. *S.S. "Campeche,"* 639 F. 2d 848, 856 (CA2 1981).[16]

---

Act perform their work, *A. N. G. Stevedores* vs. *Ellerman Lines*, 369 U. S. 355, *Blassingill* vs. *Waterman SS Corp.*, 336 F. 2d 367; for gear or equipment of stevedores or employees of stevedores subject to this Act whether used aboard ship, or ashore, *Alaska SS Co.* vs. *Peterson*, 347 U. S. 396, *Italia Societa* vs. *Oregon Stevedoring Co.*, 376 U. S. 315, or for other categories of unseaworthiness which have been judicially established. This listing of cases is not intended to reflect a judgment as to whether recovery on a particular actual setting could be predicated on the vessel's negligence." Rep., p. 10.

[16] Much is made of the Committees' statement that nothing in the bill "is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition." *Ibid.* But the statement did not explain what the vessel's "responsibility" is and what "appropriate" action might be, or when it "should have known" of the condition. The Committees did offer an example:

"So, for example, where a longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments to Section 5 would still permit an action against the vessel for negligence. To recover, he must establish that: 1) the vessel put the foreign substance on the deck, or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the

As a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoremen to unreasonable hazards.   Section 41 of the Act, 33 U. S. C. § 941, requires the stevedore, the longshoremen's employer, to provide a "reasonably safe" place to work and to take such safeguards with respect to equipment and working conditions as the Secretary of Labor may determine to be necessary to avoid injury to longshoremen.[17]  The ship is not the common employer of the longshoremen[18] and owes no such statutory duty to them.   Furthermore, as our cases indicate, the stevedore normally warrants to discharge his duties in a workmanlike manner; and although the 1972 Amendments relieved the stevedore of his duty to indemnify the shipowner for damages paid to longshoremen for injuries caused by the stevedore's breach of warranty, they did not otherwise disturb the contractual undertaking of the stevedore nor the rightful expectation of the vessel that the stevedore would perform his task properly without supervision by the ship.

---

exercise of reasonable care by the vessel under the circumstances." *Id.,* at 10–11.

However, when the failure to remove the oil spill would be "willful" or "negligent" or what the exercise of reasonable care under the circumstances would require was not explicated except to say that the "vessel will not be chargeable with the negligence of the stevedore or employees of the stevedore." *Id.,* at 11.

[17] Title 33 U. S. C. § 941 provides in relevant part as follows:

"(a) . . . Every employer shall furnish and maintain employment and places of employment which shall be reasonably safe for his employees in all employments covered by this 'chapter and shall install, furnish, maintain and use such devices and safeguards with particular reference to equipment used by and working conditions established by such employers as the Secretary may determine by regulation or order to be reasonably necessary to protect the life, health, and· safety of such employees, and to render safe such employment and places of employment, and to prevent injury to his employees."

[18] The Committees rejected the proposal that the vessel and the stevedore be considered joint employers of longshoremen.   Rep., p. 8.

The approach of the indemnity cases in this Court, beginning with *Ryan Stevedoring Co.* v. *Pan-Atlantic S.S. Corp.,* 350 U. S. 124 (1956), was that the stevedore was in the best position to avoid accidents during cargo operations and that the shipowner could rely on the stevedore's warranty to perform competently. In *Italia Societa* v. *Oregon Stevedoring Co.,* 376 U. S. 315 (1964), for example, the vessel was found liable for injuries to a longshoreman caused by an unseaworthy condition arising when the stevedore, without negligence, supplied defective equipment used in handling the cargo. We held the vessel entitled to recover over against the stevedore, saying:

> "Oregon, a specialist in stevedoring, was hired to load and unload the petitioner's vessels and to supply the ordinary equipment necessary for these operations. The defective rope which created the condition of unseaworthiness on the vessel and rendered the shipowner liable to the stevedore's employee was supplied by Oregon, and the stevedoring operations in the course of which the longshoreman was injured were in the hands of the employees of Oregon. Not only did the agreement between the shipowner place control of the operations on the stevedore company, but Oregon was also charged under the contract with the supervision of these operations. Although none of these factors affect the shipowner's primary liability to the injured employee of Oregon, since its duty to supply a seaworthy vessel is strict and nondelegable, and extends to those who perform the unloading and loading portion of the ship's work, *Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85, cf. *Pope & Talbot* v. *Hawn,* 346 U. S. 406, they demonstrate that Oregon was in a far better position than the shipowner to avoid the accident. The shipowner defers to the qualification of the stevedoring contractor in the

selection and use of equipment and relies on the competency of the stevedore company." *Id.*, at 322–323.[19]

The 1972 Amendments foreclosed indemnity of the shipowner by the stevedore in § 905 (b) cases; but they also rejected the notion of a nondelegable duty on the shipowner to provide a safe place to work and did not undermine the justifiable expectations of the vessel that the stevedore would perform with reasonable competence and see to the safety of the cargo operations.

We are of the view that absent contract provision, positive law, or custom to the contrary—none of which has been cited to us in this case—the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore. The necessary consequence is that the shipowner is not liable to the longshoremen for injuries caused by dangers unknown to the owner and about which he had no duty to inform himself. This conclusion is plainly consistent with the congressional intent to foreclose the faultless liability of the shipowner based on a theory of unseaworthiness or nondelegable duty. The shipowner, within limits, *is* entitled to rely on the stevedore, and owes no duty to the longshoremen to inspect or supervise the cargo operations. To the extent that the judgment of the Court of Appeals rested on a contrary view, we disagree.

## IV

We arrive at the more difficult and recurring issue involved in this case: What are the shipowner's duties when he learns that an apparently dangerous condition exists or has developed in the cargo operation, which is known to the steve-

---

[19] See also the cases cited in n. 11, *supra.* Of course, in the situation presented in the *Italia* case, the faultless liability of the shipowner would no longer obtain under § 905 (b).

dore and which may cause injury to the longshoreman? Must the owner take some action? Scindia and the District Court would have it that the vessel is entitled to rely on the expertise and responsibility of the stevedore and is not liable for injuries caused by dangers known by or obvious to the stevedore, who, if he fails to take proper precautions, is necessarily the sole and proximate cause of the injury. There is arguable support for this position in our cases.

In *Crumady* v. *The J. H. Fisser*, 358 U. S. 423 (1959), a ship's winch had been set by ship's officers to shut off the current at twice the safe working load of the unloading gear. The gear parted when subjected to undue strain because of the· negligence of the stevedore. The Court held the ship unseaworthy. Consistent with past cases, the Court declared that the longshoremen's protection against unseaworthiness "imposes a duty which the owner of the vessel cannot delegate," a duty which, as to appliances, "does not end with supplying them; he must keep them in order." The shipowner "is not relieved of these responsibilities by turning control of the loading or unloading of the ship over to a stevedoring company." *Id.*, at 427. The Court, nevertheless, permitted the ship to recover over from the stevedore "since the negligence of the stevedores . . . brought the unseaworthiness of the vessel into play . . . ." *Id.*, at 429.[20]

In *Crumady*, the Court declared that "those acting for the vessel owner" had adjusted the winch "in a way that made it unsafe and dangerous for the work at hand." *Id.*, at 427. It thus appeared that the vessel had at least been negligent, yet it was entitled to shift its entire liability to the stevedore

---

[20] Justice Harlan, joined by Justices Frankfurter and Whittaker, dissented, being of the view that the ship was not unseaworthy and that if it was, the ship was not entitled to indemnity if the stevedore merely brought into play the unseaworthy condition of the ship's own equipment. *Crumady* was reaffirmed in *Waterman S.S. Co.* v. *Dugan ,& McNamara, Inc.*, 364 U. S., at 423.

because it was entitled to rely on the stevedore's undertaking to perform in a workmanlike manner. Arguably, Scindia should likewise be justified in expecting Seattle to perform its undertaking and should therefore have no duty or responsibility with respect to the ship's winch, which, if defective, was obviously so and which the stevedore continued to use.

The court below rejected this position, holding that if the vessel should realize that the condition presents an unreasonable risk of harm, it is liable if it "fails to exercise reasonable care under the circumstances" to protect the longshoremen. The court did not suggest how to recognize an "unreasonable risk" of harm from an obvious danger or suggest what reasonable care under the circumstances might be.

The Court of Appeals for the Second Circuit, while disagreeing with the duty-to-inspect thesis of the Court of Appeals in the present case, has also rejected this position, ruling that although the shipowner is normally entitled to rely on the stevedore to guard against hazards to its employees, "there may be circumstances in which it would not be reasonable for the shipowner to assume that the stevedore will correct the problem." *Evans* v. *S.S. "Campeche,"* 639 F. 2d, at 856.[21] As that court sees it, mere knowledge of the

---

[21] The panel was divided. Judge Meskill wrote the principal opinion joined for the most part by Judge Friendly, who also wrote a concurring opinion. District Judge Bonsal, sitting by designation, dissented. The majority could not accept the notion that the shipowner had a continuing duty to inspect the cargo operations since "to so require would 'saddle the shipowner with precisely the sort of nondelegable duty that Congress sought to eliminate by amending section 905 (b).' *Hurst* v. *Triad Shipping Co., supra,* 554 F. 2d at 1249 n. 35." 639 F. 2d, at 856. The majority also rejected the so-called "control test" which the court thought would, inconsistently with the statute, entirely relieve the shipowner from any liability for accidents occurring in the course of operations under the control of the stevedore. The majority's approach, which is considered consistent with § 343A of the Restatement and which it called the "reasonable anticipation standard," would place a duty of care on the vessel when it would be unreasonable to assume the stevedore will deal with an

danger would not be sufficient in itself to fasten such a duty on the shipowner, but if the shipowner should anticipate that the stevedore will not or cannot correct the danger and that the longshoremen cannot avoid it, then the shipowner's duty is triggered to take steps, reasonable in the circumstances, to eliminate or neutralize the hazard. We are presently unprepared to agree that the shipowner has precisely the duty described by the Court of Appeals for the Second Circuit, but for the reasons that follow we agree that there are circumstances in which the shipowner has a duty to act where the danger to longshoremen arises from the malfunctioning of the ship's gear being used in the cargo operations.

On the facts posited here, for two days prior to the accident, it had been apparent to those working with the winch that this equipment was malfunctioning. Even so, whether it could be safely used or whether it posed an unreasonable risk of harm to Santos or other longshoremen was a matter of judgment committed to the stevedore in the first instance. The malfunctioning being obvious and Seattle having continued to use it, Scindia submits that if it was aware of the condition or was charged with knowledge of it, it was nevertheless entitled to assume that Seattle, the specialist in loading and unloading, considered the equipment reasonably safe and was entitled to rely on that judgment.

Yet it is quite possible, it seems to us, that Seattle's judgment in this respect was so obviously improvident that Scindia, if it knew of the defect and that Seattle was continuing to use it, should have realized the winch presented

---

apparent hazard—for example, "where the dangerous condition would be too difficult for the stevedore alone to remedy, or where the custom in the industry places the burden of acting on the shipowner, or where the ship affirmatively joins in the decision to continue despite the hazard." 639 F. 2d, at 856. The court should endeavor "to reach a realistic conclusion concerning the shipowner's reasonable anticipation." Id., at 856–857.

176

an unreasonable risk of harm to the longshoremen,[22] and that in such circumstances it had a duty to intervene and repair the ship's winch. The same would be true if the defect existed from the outset and Scindia must be deemed to have been aware of its condition.

As we have indicated, the legal duties placed on the stevedore and the vessel's justifiable expectations that those duties will be performed are relevant in determining whether the shipowner has breached its duty. The trial court, and where appropriate the jury, should thus be made aware of the scope of the stevedore's duty under the positive law. But an equally necessary inquiry is whether the pertinent statutes, regulations, or custom place or assume a continuing duty on the vessel to repair defective ship's gear being used by the stevedore in the cargo operation.[23]

The statutory duty of the stevedore under § 941 to provide a safe place to work has been implemented by the Safety and Health Regulations for Longshoring. 29 CFR § 1918.1 et seq. (1980). Subpart F of these regulations, § 1918.51 et seq., deals with the use of the ship's gear by the stevedore. Section 1918.51 (b) provides that "[a]ny component of cargo handling gear . . . which is visibly unsafe shall not be used until made safe." In addition, § 1918.53, dealing with cargo winches, provides that "[a]ny defect or malfunction of winches shall be reported immediately to the officer in charge of the vessel," § 1918.53 (a)(5); that in the case of electrical winches "[w]hen the electromagnetic or other service brake is unable to hold the load, the winch shall not be used,"

[22] We agree with the Court of Appeals that the shipowner may not defend on the ground that Santos should have refused to continue working in face of an obviously dangerous winch which his employer, Seattle, was continuing to use. The District Court erred in ruling otherwise, since the defense of assumption of risk is unavailable in § 905 (b) litigation. See also Napoli v. Hellenic Lines, Ltd., 536 F. 2d, at 509.

[23] It may also be that the contract between the stevedore and the shipowner will have provisions specifically bearing on the dispute. The contract between Scindia and Seattle is not part of the record in this case.

§ 1918.53 (c)(1); and that "[e]mployees shall not be permitted to tamper with or adjust electric control circuits," § 1918.53 (c)(2).[24] Even in the absence of other statutory or regulatory law placing on the shipowner the obligation to repair a defective winch,[25] a possible inference from the

[24] Petitioner acknowledged in its brief that only the shipowner could have repaired the defective winch, Brief for Petitioner 24, but argued that even if notified of the defect, it would merely have had the opportunity, but not the duty, to repair. Tr. of Oral Arg. 10.

[25] The United States Coast Guard has issued regulations with respect to the gear and equipment of cargo ships. 46 CFR Ch. 1, Subchapter 1, Cargo and Miscellaneous Vessels (1980). For ships to which the regulations are applicable, the shipowner must obtain a certificate of inspection at stated intervals. There are detailed requirements for the testing of winches. There is provision for accepting the certificate of private testing organizations recognized by the Coast Guard, such as the International Cargo Gear Bureau, Inc., which has its own manual specifying necessary testing procedures. The regulations, however, do not appear to specify the respective duties of the vessel and the stevedore in situations such as we now have before us. Scindia asserts that the Coast Guard regulations place no continuing duty on the shipowner to inspect the ship's equipment during cargo operations. Tr. of Oral Arg. 14. Also, the M/S *Jalaratna* appears to be an Indian ship and may not be covered by the regulations, which do not apply to "[a]ny vessel of a foreign nation signatory to the International Convention for Safety of Life at Sea, 1960, and which has on board a current, valid safety equipment certificate." 46 CFR § 90.05–1 (1980).

We note with some interest that in affirming a jury verdict for a longshoreman in *Irizarry* v. *Compania Maritime Navegacion Netumar, S. A.,* No. 79–7876 (CA2, May 22, 1980), cert. pending, No. 80–94, the Court of Appeals for the Second Circuit relied on the Joint Maritime Safety Code issued by the New York Shipping Association, Inc., the International Longshoremen's Association, and the Port of New York Joint Safety Committee. The Code was prepared pursuant to the terms of the labor agreement between the shipping association and the longshoremen's union and contains what is described as "the commonly agreed on practices for working together safely." The provision of the Code relied on by the Court of Appeals states that "[t]he owner, master and officers of the vessel shall supply and maintain in safe condition for use all ship's gear equipment, tools and work spaces which are to be used in stevedoring operations."

provisions already described is that when a defective winch is discovered, it should not be repaired by the stevedore but should be reported to and repaired by the shipowner. If this is the case, the situation comes down to this: If Scindia was aware that the winch was malfunctioning to some degree, and if there was a jury issue as to whether it was so unsafe that the stevedore should have ceased using it, could the jury also have found that the winch was so clearly unsafe that Scindia should have intervened and stopped the loading operation until the winch was serviceable?

We raise these questions but do not answer them, since they are for the trial court in the first instance and since neither the trial nor appellate courts need deal with them unless there is sufficient evidence to submit to the jury either that the shipowner was aware of sufficient facts to conclude that the winch was not in proper order, or that the winch was defective when cargo operations began and that Scindia was chargeable with knowledge of its condition. The District Court concluded that there was no triable issue of fact as to whether the shipowner knew or should have known of the alleged condition of the winch. The Court of Appeals read the record quite differently, ruling that there was a disputed material fact, which the District Court should not itself have resolved, with respect to the shipowner's actual or constructive knowledge of the condition of the winch. To the extent that this conclusion was based on the Court of Appeals' erroneous view that the vessel should have known the facts because of its duty to inspect the stevedore's cargo handling operation, it was infirm. But as we understand the opinion below, the Court of Appeals held that there was a triable issue as to whether the shipowner had actual knowledge of the failure in the winch's braking mechanism or was chargeable with knowledge because the winch was defective from the outset. Based on our own examination of the record, we agree with the Court of Appeals in this respect and with its conclusion that the District Court erred in granting

summary judgment. The case should be returned to the District Court and, if necessary, tried to a jury under appropriate instructions.[26]

Accordingly, we affirm the judgment of the Court of Appeals and remand the case to that court for further proceedings consistent with this opinion.

*So ordered.*

THE CHIEF JUSTICE took no part in the decision of this case.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL and JUSTICE BLACKMUN join, concurring.

My views are that under the 1972 Amendments: (1) a shipowner has a general duty to exercise reasonable care under the circumstances; (2) in exercising reasonable care, the shipowner must take reasonable steps to determine whether the ship's equipment is safe before turning that equipment over to the stevedore; (3) the shipowner has a duty to inspect the equipment turned over to the stevedore or to supervise the stevedore if a custom, contract provision, law or regulation creates either of those duties; and (4) if the shipowner has actual knowledge that equipment in the control of the stevedore is in an unsafe condition, and a reasonable belief that the stevedore will not remedy that condition, the shipowner has a duty either to halt the stevedoring operation, to make the stevedore eliminate the unsafe condition, or to eliminate the unsafe condition itself.

---

[26] Of course, it has not been determined whether the winch was defective or if it was, when it became defective and whether the defect contributed to the accident. If the effective cause was a simple act of operational negligence by the crane operator or the hatch tender, the vessel would not be liable in any event. Cf. *Usner* v. *Luckenbach Overseas Corp.,* 400 U. S. 494 (1971). The District Court apparently thought this conclusion was necessitated by the fact that the stevedore was in operational control and was necessarily the sole cause of the accident.

Since I read the Court's opinion to be consistent with these views, I join the Court's opinion.

JUSTICE POWELL, with whom JUSTICE REHNQUIST joins, concurring.

I join the Court's opinion because I agree with its basic thrust—placing the primary burden on the stevedore for avoiding injuries caused by obvious hazards. I write only to emphasize the distinction between this approach and the general "reasonableness" standard adopted by the Ninth Circuit in this case.

Under the Court's opinion, "the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore." *Ante,* at 172. In addition, the opinion makes clear that the shipowner has only a limited duty with respect to obvious hazards of which it *is* aware. Although the shipowner cannot rely in all cases on the judgment and primary responsibility of the stevedore concerning what conditions allow safe work to continue, safety is a "matter of judgment committed to the stevedore in the first instance." *Ante,* at 175. Only where the judgment of the stevedore is "obviously improvident," *ibid.,* and this poor judgment either is known to the shipowner or reasonably should be anticipated under the circumstances, does the shipowner have a duty to intervene.[1] As the opinion points out, the customs and regulations allocating responsibility for particular repairs are highly relevant to this inquiry.

---

[1] In my view, the Restatement standard adopted by the Second, Fourth, and Fifth Circuits, see *ante,* at 162, n. 9, and discussed most recently in *Evans* v. *S.S. "Campeche,"* 639 F. 2d 848 (CA2 1981), is consistent with the plain intent of Congress to impose the primary responsibility on the stevedore. Although it is unnecessary in this case for the Court to adopt this standard fully, I do not understand our opinion to be inconsistent with it.

The difficulty with a more general reasonableness standard like that adopted by the court below is that it fails to deal with the problems of allocating responsibility between the stevedore and the shipowner. It may be that it is "reasonable" for a shipowner to rely on the stevedore to discover and avoid most obvious hazards. But when, in a suit by a longshoreman, a jury is presented with the single question whether it was "reasonable" for the shipowner to fail to take action concerning a particular obvious hazard, the jury will be quite likely to find liability. If such an outcome were to become the norm, negligent stevedores would be receiving windfall recoveries in the form of reimbursement for the statutory benefit payments made to the injured longshoremen.[2] This would decrease significantly the incentives toward safety of the party in the best position to prevent injuries, and undercut the primary responsibility of that party for ensuring safety.

---

[2] Under 33 U. S. C. § 905 (b), the shipowner is liable in damages to the longshoreman if it was negligent, and it may not seek to recover any part of this liability from the stevedore. The longshoreman's recovery is not reduced to reflect the negligence of the stevedore. *Edmonds* v. *Compagnie Generale Transatlantique*, 443 U. S. 256 (1979). Under 33 U. S. C. § 933, the stevedore—even if concurrently negligent—receives reimbursement for its statutory benefit payments to the longshoreman, up to the full amount of those payments. See also *Bloomer* v. *Liberty Mutual Ins. Co.*, 445 U. S. 74 (1980) (stevedore's lien is not reduced by its proportional share of the costs of litigating the negligence suit). As a result of this automatic reimbursement, there is a danger that "concurrently negligent stevedores will be insulated from the obligation to pay statutory workmen's compensation benefits, and thus will have inadequate incentives to provide a safe working environment for their employees." *Edmonds, supra*, at 274 (BLACKMUN, J., dissenting). In cases involving obvious and avoidable hazards, this danger will be realized unless the shipowner's liability is limited to the unusual case in which it should be anticipated that the stevedore will fail to act reasonably. Any more stringent, or less defined, rule of shipowner liability will skew the statutory scheme in a way Congress could not have intended. Cf. *Canizzo* v. *Farrell Lines, Inc.*, 579 F. 2d 682, 687–688 (CA2 1978) (Friendly, J., dissenting).