[No. A015563. First Dist., Div. Four. Feb. 27, 1986.]

FRED WHITEHILL, Plaintiff and Appellant, v.
UNITED STATES LINES, INC., Defendant and Respondent.

1202

**1204**

COUNSEL

J. Fred Haley for Plaintiff and Appellant.

McCutchen, Doyle, Brown & Enersen, Richard C. Brautigam, John Edward Hurley, Jr., and Robert A. Lewis for Defendant and Respondent.

OPINION

**CHANNELL, J.**—Fred Whitehill, a longshoreman who was injured while unloading cargo, appeals from a judgment based on a jury verdict in favor of the shipowner United States Lines, Inc.

Viewing the evidence in the light most favorable to the prevailing party, as we must on appeal (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925-926 [101 Cal.Rptr. 568, 496 P.2d 480]), the following appear to be the pertinent facts presented at trial.

On July 1, 1976, Whitehill was employed by the California Stevedore and Ballast Company to help unload U. S. Lines' ship, *American Corsair*, which was docked at the West Oakland Army Terminal. Whitehill's gang was working the night shift and unloaded cargo from the ship's aft starboard deep tank in the No. 5 hold. The deep tank is the ship's bottom-most cargo area. Above it are the ship's three decks: the lower 'tween deck (lower deck), the upper 'tween deck (upper deck) and the main deck. Cargo is taken in and out of the deep tanks through hatches in the lower deck. The covers to those hatches are called deep tank lids. When closed, a deep tank

lid is horizontal and is part of the lower deck. When open, it is nearly vertical and creates the hatch to the deep tank through which cargo is raised and lowered.

There are four deep tank lids in the No. 5 hold. The lid to the deep tank in which Whitehill's gang was working is designated lid No. 6. That lid is metal and weighs approximately three and one-half tons.

When cargo is loaded and unloaded, the longshoremen, rather than the ship's crew, open and close the deep tank lids. The deep tank lid is raised to a vertical position by a lifting cable that is run from the lid through a hole in the upper deck and attached to the winch hoist wire on a boom. The lid is then held open by a metal gravity latch which drops over the top of the lid and prevents it from falling.

It is common practice that once the lid is raised, the lifting cable is detached from the winch line and attached to a cleat. The cable then provides backup protection for the latch. In fact, the cleated lifting cable is often referred to as a safety line. Alternatively, the longshoremen can use a separate lashing as a backup safety line. U. S. Lines kept wires for this purpose in each hold. The No. 5 hold of the *American Corsair* was equipped with a separate lashing to be used as a backup safety line for each deep tank lid.

When Whitehill's gang arrived for work, the No. 6 deep tank lid had already been opened by the stevedore's day shift, which had been unloading cargo from the deep tank. After the deep tank was unloaded, Whitehill's gang began to close the No. 6 lid. K. C. Jackson, a member of the gang, remained on the lower deck to unlatch the deep tank lid. Joe Booth and Whitehill went to the upper deck in order to uncleat the lifting cable and transfer it to the winch. In order to gain access to the cleat and winch, the longshoremen had to walk on a two-and-one-half-foot ledge. The lifting cable was tangled on the cleat and Booth asked Whitehill for assistance. Whitehill succeeded in removing the lifting cable from the cleat; however, as he attempted to hook the cable onto the winch, the deep tank lid became unlatched and fell shut. Whitehill, who had the lifting cable in his hand, was pulled by the weight of the deep tank lid into the hold. Whitehill fell 12 feet to the steel deck below, sustaining severe injuries.

There was conflicting evidence as to why the lid unexpectedly fell. Whitehill's expert witness opined that the gravity latch was not fully engaged on the lid at the time the accident occurred. This could be caused either by the latch not being fully engaged when the lid was initially raised or by a load of cargo, while being unloaded, hitting the lid and disengaging the latch. U. S. Lines' experts testified that cargo striking the lid could not

disengage the latch and that they believed the accident occurred because somebody prematurely released the latch.

*Evidence Regarding Ledge*

Two of Whitehill's expert witnesses were prepared to testify that the 30-inch-wide ledge from which Whitehill fell constituted an unsafe condition. Whitehill contends the trial court erred in excluding such evidence concerning the ledge.

Before addressing Whitehill's contention a brief discussion of the applicable law is required. The instant action was brought under the Longshoremen's and Harbor Workers' Compensation Act (Act) (33 U.S.C. § 901 et seq.) and, accordingly, is governed by federal law. (*Keith* v. *S. S. Goldstone* (1978) 81 Cal.App.3d 699, 703 [146 Cal.Rptr. 639].) In 1972 Congress substantially amended the Act and redefined and limited the circumstances under which a shipowner was liable to longshoremen. In discussing the 1972 amendment the United States Supreme Court states: "Prior to 1972, a longshoreman injured while loading or unloading a ship could receive compensation payments and also have judgment against the shipowner if the injury was caused by the ship's unseaworthiness or negligence. [Citation.] Proof of unseaworthiness required no proof of fault on the part of the shipowner other than an unsafe, injury-causing condition on the vessel. This was true even though the condition was caused, created, or brought into play by the stevedore or its employees. In the latter event, the shipowner could recover over against a stevedore for breach of express or implied warranty to handle the cargo in a reasonably safe manner. [Citation.] [¶] The 1972 Amendments, particularly by adding § 905(b),[1] radically changed this scheme of things. The compensation payments due the long-

---

[1] 33 United States Code section 905(b), which also governs the instant case, provides as follows: "In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel. If such person was employed to provide shipbuilding, repairing, or breaking services and such person's employer was the owner, owner pro hac vice, agent, operator, or charterer of the vessel, no such action shall be permitted, in whole or in part or directly or indirectly, against the injured person's employer (in any capacity, including as the vessel's owner, owner pro hac vice, agent, operator, or charterer) or against the employees of the employer. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter."

shoreman from the stevedore for injuries incurred in the course of his employment were substantially increased; the longshoreman's right to recover for unseaworthiness was abolished; his right to recover from the shipowner for negligence was preserved in § 905(b), which provided a statutory negligence action against the ship; and the stevedore's obligation to indemnify the shipowner if the latter was held liable to the longshoreman was abolished." (*Scindia Steam Navagation Co.* v. *De Los Santos* (1981) 451 U.S. 156, 164-165 [68 L.Ed.2d 1, 10-11, 101 S.Ct. 1614].)

■ In the high court's view "Congress intended to make the vessel answerable for its own negligence and to terminate its automatic, faultless responsibility for conditions caused by the negligence or other defaults of the stevedore." (*Scindia, supra,* 451 U.S. at p. 168 [68 L.Ed.2d at p. 13].) Thus, the *Scindia* court held that the shipowner owes limited duties to the longshoremen: Prior to the commencement of stevedoring operations the owner must (1) exercise "[O]rdinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property," and (2) warn "the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, . . ." (*Id.*, at p. 167 [68 L.Ed.2d at p. 12].) Once the stevedoring operations have begun "The shipowner, within limits, *is* entitled to rely on the stevedore, and owes no duty to the longshoremen to inspect or supervise the cargo operations." (*Id.*, at p. 172 [68 L.Ed.2d at p. 15], italics in original.) However, if a shipowner is not actively involved in cargo operations,[2] he only has a duty to intervene when he has knowledge of a defect and the stevedore's judgment about the defect is "so obviously improvident" that the defect presents "an unreasonable risk of harm to the longshoremen." (*Id.*, at pp. 175-176 [68 L.Ed.2d at pp. 17-18]; *Dugas* v. *C. Brewer & Co.* (1985) 165 Cal.App.3d 203, 209-210 [211 Cal.Rptr. 573].)

■ Following *Scindia,* federal case law has held that the present statutory scheme places the duty of providing safety equipment upon the stevedore and that the stevedore is liable for injuries to workmen that result from any breach of that duty; it is only the exceptional case in which the shipowner is liable. (*Bandeen* v. *United Carriers (Panama) Inc.* (9th Cir. 1983) 712 F.2d 1336, 1340-1341.) While it may be possible for a longshoreman

---

[2] A vessel may also be liable if it is actively involved in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen "to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." (*Scindia Steam Navigation Co.* v. *De Los Santos, supra,* 451 U.S. at p. 167.)

to bring a products liability claim against the builder of a ship (see, e.g., *Hedrick* v. *Daiko Shoji Co., Ltd., Osaka* (9th Cir. 1983) 715 F.2d 1355, vacated on a different point 733 F.2d 1335), the longshoreman may not bring such a claim against the shipowner. (*Wilhelm* v. *Associated Container Transp. (Australia) Ltd.* (9th Cir. 1981) 648 F.2d 1197, 1198.) This is because the shipowner now may only be held liable when the injured long-shoreman can prove that the shipowner is negligent. (*Ibid.*) The shipowner gives no warranty that the vessel is free from defect. (*Bilderbeck* v. *World Wide Shipping Agency* (9th Cir. 1985) 776 F.2d 817, 818.)

■ In the present case, the trial court, in ruling on the admissibility of expert testimony concerning the design of the ledge from which Whitehill fell, made the following statement: "[W]e are not trying a products liability case. We are trying a latent defect situation. And insofar as [evidence goes] to the latency of any defect, that's going to be admissible. Insofar as you [are] trying to foist on the ship owner a duty to provide safe products, that's not going to be admissible."

The trial court's ruling was correct. While U. S. Lines had a duty to have the ship and its equipment in such condition that the stevedore might carry on its cargo operations with reasonable safety, under the current law it may not be held strictly liable for design defects in the ship. The American Corsair is not an unusual ship; it is a type of vessel which is familiar to longshoremen in the Bay Area. In his offer of proof, plaintiff's own expert admitted that the width of the ledge resulted from the hatch's relationship to a "permanent bulkhead" which was "designed right into the ship" as part of the original ship plan and that "there was no choice of moving anything." Thus, in the absence of any evidence that U. S. Lines had been made aware of the alleged unsafe condition or was in a better position than the stevedore to detect the alleged defect (*Biggs* v. *Logicon, Inc.* (8th Cir. 1981) 663 F.2d 52, 54), it was proper to exclude expert testimony that the ledge constituted a defective design.[3]

*Alternatives to the Gravity Latch*

In a somewhat similar argument Whitehill contends that the trial court erred in precluding him from introducing evidence of safer methods for securing the deep tank lid. In his offer of proof Whitehill's experts stated that the gravity latch on the deep tank lid was unsafe because it failed to provide a completely independent back-up system. Both experts recom-

---

[3]Although Whitehill also claims that the excluded evidence was relevant to some breach of contract claim, no such claim was pleaded nor was any evidence of a contract introduced at trial.

mended that a locking pin should be installed in the latch. The court rejected the introduction of such evidence for the same reason it excluded the evidence concerning the ledge.

We can quickly dispose of this argument. As previously stated, the *Scindia* decision requires that the shipowner exercise ordinary care to have the ship and its equipment in such condition that the stevedore can carry on its cargo operations with reasonable safety. ■ However, it is the stevedore that has the duty to provide safety appliances. (*Bandeen, supra,* 712 F.2d at p. 1340.) "To permit a jury to reimpose, under the guise of negligence, back-up liability for the stevedore's failure to provide adequate safety devices would be to repeal the statutory amendments and restore the pre-1972 practice which allowed longshoremen and their employers to pass the cost of loading and unloading accidents back to the ship under the rubric of unseaworthiness. The trial court correctly refused to frustrate the intent of Congress in this manner." (*Id.,* at p. 1341.)[4]

*Evidence of Prior Accident*

One year prior to Whitehill's accident, a deep tank lid fell on another U. S. Lines ship, the *Pioneer Moon:* A report concerning the accident was sent to the *Pioneer Moon.* Certain portions of the report were introduced into evidence to show notice to U. S. Lines. Whitehill contends that the trial court erroneously excluded two pieces of evidence that were critical to showing that the shipowner had knowledge that the deep lid securement method posed a latent danger: First, the court excluded that portion of the report that stated, "it is recommended that the details of this accident be widely disseminated to emphasize the dangers involved in working in a marine environment in order to encourage common sense and safety." Second, the court excluded a part of deposition testimony of the *Pioneer Moon*'s chief mate[5] in which he stated that the captain of the *Pioneer Moon* had notified U. S. Lines that the captain had placed a stencil on deep tank lids informing longshoremen to secure preventer wires on raised deep tank lids.

With respect to the accident report, Whitehill initially agreed to the deletion of that portion of the report which he now contends should not have been excluded. Even if that were not so, the report was entered in evidence to show U. S. Lines' *knowledge* of a potential latent defect. While the facts

---

[4]It should be noted that Whitehill was not prejudiced by the exclusion of the proferred testimony. Whitehill's experts admitted that an independent back-up system could be established by preventer wires running from the deep tank lid to the skin of the ship. Such preventer wires were available on the *American Corsair.*

[5]The chief mate was deceased at the time of trial.

pertaining to the *Pioneer Moon* accident were relevant to the issue of knowledge, subsequent recommendations provided no additional notice of the facts. ■ Regarding the chief mate's testimony, the court properly ruled that it constituted hearsay, since he was merely reporting what the captain had told him about the captain's report to U. S. Lines. Moreover, the report concerning stencils was not relevant to the issue of the shipowner's knowledge of a latent defect.

*Visit to the American Corsair*

■ Whitehill next maintains that the trial court committed reversible error by permitting U. S. Lines' expert to testify regarding a visit he made to the ship three weeks after trial began. The defendant's expert witness had visited the *American Corsair* for purposes of conducting tests and gathering information to support his opinion. Whitehill submits that the late visit did not allow his counsel to additionally depose the expert and violated Code of Civil Procedure sections 2037.3 and 2037.5.[6] He also contends the court erred in failing to grant his request for a new trial on the grounds of surprise. Whitehill is correct in his assertion that pursuant to section 2037.3, when an appropriate demand is made, the party proferring the evidence is required to disclose the general substance of the testimony an expert witness is expected to give at trial. "Only by such a disclosure will the opposing party have reasonable notice of the specific areas of investigation by the expert, the opinions he has reached and the reasons supporting the opinions, to the end the opposing party can prepare for cross-examination and rebuttal of the expert's testimony." (*Kennemur* v. *State of California* (1982) 133 Cal.App.3d 907, 919 [184 Cal.Rptr. 393].) However, where, as here, the court offers to recess the trial in order for counsel to depose the witness and possibly obtain rebuttal evidence yet counsel refuses to accept the offer, we find no prejudice. Since Whitehill was given every opportunity to recover from any disadvantage occasioned by the surprise, there was no need to grant his motion for new trial.

*Jury Instruction*

■ Whitehill also claims that the lower court erred in failing to give the following instruction to the jury: "In addition, United States Lines, Inc.

---

[6]Code of Civil Procedure section 2037.3 provides in pertinent part: "Each witness list shall include the name and business . . . of each expert witness whom the party expects to call in person . . . and a brief narrative statement of . . . the general substance of the testimony which the witness is expected to give."

Code of Civil Procedure section 2037.5 provides in pertinent part: ". . . no party required to serve a list of expert witnesses on the objecting party may call an expert witness to testify, except for purposes of impeachment, unless the requirements of Section 2037.3 for that witness have been met."

All codes refer to the Code of Civil Procedure unless otherwise indicated.

may not defend on the ground that Fred Whitehill should have refused to continue working in face of a dangerous situation which his employer, the stevedoring company, was continuing to use. The defense of assumption of the risk is not available." The claim is without merit.

Under the terms of the Act, a defendant may not assert assumption of the risk as a defense. Accordingly, the defense neither pleaded nor argued Whitehill's assumption of the risk.[7] As was stated in a similar case, "[T]he instruction is pure surplusage. Nothing in the case calls for it to be given. Defendant neither pleaded nor argued assumption of the risk as a defense and plaintiff does not point out anything in the record which makes it necessary to instruct that a nonraised, nonexistent defense is to be disregarded." (*Keith* v. *S. S. Goldstone, supra,* 81 Cal.App.3d at p. 711.)

*Punitive Damages*

Since we find that the jury's verdict for defendant U. S. Lines resulted from a fair and error-free trial, we need not address Whitehill's contention that he is entitled to punitive damages.

The judgment is affirmed.

Anderson, P. J., and Poché, J., concurred.

A petition for a rehearing was denied March 20, 1986, and appellant's petition for review by the Supreme Court was denied June 20, 1986. Bird, C. J., was of the opinion that the petition should be granted.

---

[7]Although defense counsel, at one point, questioned a member of Whitehill's gang as to whether a longshoreman had the right to complain about unsafe conditions, and plaintiff's counsel did not object, it does not appear that U. S. Lines relied on any assumption-of-the-risk theory of defense.