**Harold MAGEE, Plaintiff,**

v.

**BAYOU TECHE, and its owner, Oil Transport Company, Inc., American Marine Corporation, Ralph S. Holt Testing Laboratories, Inc., Defendants.**

Civ. A. No. 80–2201.

United States District Court,
E. D. Louisiana.

July 28, 1982.

Joseph W. Thomas, New Orleans, La., for plaintiff.

B. Ralph Bailey, Donald Bann, Metairie, for intervenor, American Marine Corp.

James M. Tompkins, Richard L. Duncan, New Orleans, La., for defendant Oil Transport Co., Inc.

James A. Cobb, Jr., New Orleans, La., for defendant Ralph S. Holt Testing Laboratories, Inc.

CASSIBRY, District Judge:

## OPINION

Plaintiff, Harold Magee, a shipfitter employed by American Marine Corporation

("American Marine"), filed suit for damages against Oil Transport Company, Inc. ("Oil Transport") under 33 U.S.C. § 905(b) as owner of the barge BAYOU TECHE, and also against Ralph S. Holt Testing Laboratories, Inc. ("Holt Laboratories") for negligent inspection of the BAYOU TECHE. Mr. Magee's employer, American Marine, intervened in this action, seeking return of the funds which it paid to Mr. Magee under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq. Plaintiff subsequently named American Marine as a defendant.[1] American Marine then filed a cross-claim against Oil Transport, and Oil Transport filed a cross-claim against Holt Laboratories.

As more specifically outlined below, I find that the plaintiff's injury was caused by the negligence of American Marine only. The plaintiff's exclusive remedy against American Marine, his employer, is compensation under the Longshoremen's and Harbor Workers' Compensation Act.

## FINDINGS OF FACT

### 1.

Plaintiff, Harold Magee, is 37 years old. Mr. Magee was employed as a shipfitter by American Marine from January 7, 1969 to February 28, 1980, the date of the accident that is the subject of this suit.

### 2.

The BAYOU TECHE is owned by Oil Transport. On or about February 21, 1980, the two cargo tanks of the BAYOU TECHE were flushed out with "asphalt" and the vessel was towed to American Marine's shipyard for repairs. The vessel was left unmanned by Oil Transport personnel at the shipyard.

### 3.

The last cargo carried on the BAYOU TECHE prior to the flushing out was "cutter stock," a substance comparable to diesel fuel.

1. This claim was dismissed prior to trial.

### 4.

On or about February 25, 1980, a representative of Oil Transport requested that American Marine replace the barge's expansion trunk and repair a crack in the inner wall of the barge's number two cargo tank. Oil Transport never requested that any other repairs be performed by American Marine on the BAYOU TECHE.

### 5.

American Marine secured the BAYOU TECHE abreast and outboard of another barge which, in turn, was secured to the dock at the north end of the shipyard. However, no gang plank connected these two vessels.

### 6.

American Marine personnel opened the barge and injected forced draft air inside of her tanks.

### 7.

On February 25, 1980, American Marine requested that Mr. Ralph Holt, a marine chemist certified by the National Fire Protection Association ("NFPA"), and president of Holt Laboratories, inspect the BAYOU TECHE before repair work commenced. Mr. Holt was informed that welding was going to be done only inside of and on the outer perimeter of the expansion trunk on the barge's number two cargo tank. He was also informed that the last cargo carried by the barge was "asphalt."

### 8.

Mr. Holt inspected the barge and then issued a certificate indicating that the barge's fourteen wing tanks, bow and stern rake tanks, and two cargo tanks were "safe for fire" and "safe for men." However, Mr. Holt did not perform any tests on cargo residue in the cargo tanks to determine if such residues were capable of producing flammable conditions in the presence of fire.

Mr. Holt stipulated on his certificate that a fire watch should be kept during all hot work operations such as welding.

**9.**

As of February 28, 1980, the repair work on the crack in the number two cargo tank and the replacement of the barge's expansion trunk had been completed.

**10.**

On February 28, 1980, Mr. Magee and his welding crew were instructed by Mr. Peter Durant of American Marine to install new insulation on the inside walls of the barge's number two cargo tank, and to repair old insulation that had fallen from the ceiling of this tank. (In 1976, Oil Transport installed foamglass insulation inside the BAYOU TECHE's cargo tanks in an attempt to make the barge more energy efficient. The insulation was held in place by metal strips that were tack-welded to the walls and ceiling of the cargo tanks. However, the vibrations of the vessel caused some of the insulation to break and fall to the bottom of the cargo tank).

**11.**

Mr. Holt, the marine chemist, was never informed that hot work on the insulation was to be done.

**12.**

Before the lunch break on February 28, 1980, the installation of new insulation in the number two cargo tank was effected without incident. After returning from lunch, the welding crew commenced repair on the old insulation in another area of the number two cargo tank, approximately ten to twenty feet from the location of the welding that had taken place in the morning. When the first welder made a tack on one of the overhead cross beams that was supporting the old insulation, something immediately began to smoke and then burst into flames. One of the other shipfitters in the crew who was standing by with a water hose started dousing the fire, but the flames quickly spread throughout the cargo tank. The entire repair crew abandoned the barge. As Mr. Magee jumped from the BAYOU TECHE onto the adjacent barge, he fell and seriously injured his knee.

**13.**

Some of the old insulation near the ceiling of cargo tank number two was coated with cutter stock residue. Any flushing out of the barge with asphalt did not completely erradicate or "coat over" this cutter stock residue. The tests performed by Mr. Joseph Harris, who testified as an expert in chemistry, also support this finding. Although the foamglass insulation itself may be fire-proof and basically non-porous, the outer surface of the old insulation was, in some spots near the cargo tank ceiling, coated with cutter stock residue. The marine chemist, Mr. Holt, testified in his deposition [2] that the insulation on the BAYOU TECHE was "coated" although he erroneously assumed that the coating was entirely asphalt. But in short, the record clearly establishes that the insulation was capable of being coated with residue.

**14.**

It was the cutter stock residue on the old foamglass insulation in cargo tank number two that ignited and caused the fire when the welders commenced their work on this insulation.

**15.**

No welding work on *old* insulation that was coated with cargo residue was done prior to the time that the fire occurred on February 28, 1980.

**16.**

All adjacent spaces in cargo tank number two had not been cleaned sufficiently to prevent the spread of fire.

**17.**

American Marine did not have a "competent person" monitoring any of the repair work on the BAYOU TECHE, as required by 29 C.F.R. § 1915.10.

**18.**

On February 29, 1980, the day after the fire, Mr. Holt again inspected the BAYOU TECHE and issued a certificate. This certificate indicated that the barge's two cargo tanks were "safe for fire," but contained a qualification that "hot work shall not con-

**2.** Mr. Holt died prior to trial.

tact cargo residues on bottoms of cargo tanks."

## CONCLUSIONS OF LAW

### A. Oil Transport

#### 1.

■ As a vessel repairer, Mr. Magee's exclusive cause of action against the owner of the BAYOU TECHE, Oil Transport, is under 33 U.S.C. § 905(b) which provides in part:

> In the event of injury to a person covered under this Act caused by the negligence of a vessel, then such person ... may bring an action against such vessel as a third party.... If such person was employed by the vessel to provide shipbuilding or repair services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing shipbuilding or repair services to the vessel.

Thus, unless plaintiff was injured as a result of some vesselowner negligence, as opposed to some shiprepairer negligence, he has no cause of action against the vessel owner, Oil Transport. I find that no negligence by Oil Transport contributed to the plaintiff's injury.

#### 2.

■ In turning a vessel over to a repairman, the shipowner's duty is to exercise ordinary care under the circumstances to have the vessel in such condition that an expert and experienced repairman will, by the exercise of reasonable care, be able to carry on the repair operations with reasonable safety to persons and property. The shipowner must also warn the repairman of any hazards on the ship that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the repairman in the course of his repair operations *and* that are *not* known by the repairman and would not be obvious to him if reasonably competent. *See, e.g., Scindia Steam Navigation Compa-*

*ny, Ltd. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 1621–22, 68 L.Ed.2d 1 (1981).

Oil Transport exercised reasonable care to have the BAYOU TECHE in a safe condition when it relinquished custody of the vessel to American Marine for the repair work that Oil Transport had requested. In fact, all of the repair work which Oil Transport requested was performed without incident.

#### 4.

■ After delivering a vessel in safe condition to a shiprepairer, a shipowner does not have a continuing duty to oversee the shiprepair facility's activities or to ensure the safety of the repairmen. *See, e.g., McQuiston v. Freighters and Tankers Steamship Co.,* 217 F.Supp. 701 (E.D.La. 1963), *aff'd.,* 327 F.2d 746 (5th Cir. 1964).

#### 5.

■ Even if it were assumed, *arguendo,* that Oil Transport knew that American Marine might make unrequested repairs involving hot work on cargo-coated insulation, there are no applicable regulations of the industry which impose a duty upon Oil Transport to discover what risks might be encountered. On the contrary, industry regulations reflect that Oil Transport had a right to rely on the advice of its experts, American Marine and Holt Laboratories, with regard to any dangers that might have been encountered in repairing the vessel.

Under Occupation Safety and Health Act regulations, 29 C.F.R. § 1915.13, employers are prohibited from allowing employees to engage in hot work in or on tank vessels until a certificate is issued by an NFPA certified chemist setting forth that the hot work can be done in safety. Such a certificate was obtained in this case.

The provisions of 46 C.F.R. 35.01 and 91.50–1, which are Coast Guard regulations, state that whenever hot work is to be done within the boundaries of cargo tanks which have been used to carry combustible materials in bulk, the provision of "Standard for the Control of Gas Hazards on Vessels to be

Repaired," NFPA No. 306, "shall be used as a guide" in conducting the inspections and issuance of certificates required by these C.F.R. sections. NFPA No. 306 makes it clear that the burden for the safety of repairs involving hot work aboard tank vessels is placed upon the vessel repairer and the marine chemist. Chapter 2–5.1 states that it "shall be" the responsibility of the vessel repairer to retain the services of the marine chemist, to secure copies of his certificate, and to provide the master of the vessel and the representatives of the vessel owner with copies of such certificates.

6.

█ It is of no great moment that Oil Transport took no part in the inspection of the BAYOU TECHE after it entered the American Marine shipyard. FNPA No. 312 chapter 2–1.2 provides that as soon as possible after a vessel enters a repair yard, and before any work is started, an inspection of the vessel *shall* be made by a yard representative to evaluate the potential fire hazard, and a representative of the owner shall join the yard representative *if* such a representative of the owner is available. This provision merely clarifies that a representative of the vessel should take part in the inspection if he is available, as in the case where a vessel is manned by the crew when delivered to the shipyard. The BAYOU TECHE was left unmanned at the American Marine shipyard because the shipyard was not able to commence work on the vessel until several days after the vessel was delivered. Under these circumstances, the primary responsibility for the inspection lies with the shipyard.

7.

█ The condition of the residue-coated insulation was not a "defect" which Oil Transport knew or should have known about. Oil Transport could not have known nor been chargeable with knowledge that product-coated insulation might be a fire hazard during repair operations because it did not know that repair operations were going to involve hot work on the insulation. Even if Oil Transport had known or should have known that such repairs were going to take place, it could not have known that such hot work would be hazardous because Mr. Holt, the NFPA certified marine chemist, had certified that the number two cargo tank was "safe for fire."

8.

█ Under the circumstances involved in this case, it is not significant that Oil Transport did not correct the marine chemist's certificate which indicated that the last cargo carried by the BAYOU TECHE was asphalt. Regardless of what "last cargo" is entered on the certificate, the vessel owner does not necessarily know its precise flash point, and, therefore, must rely on the marine chemist to determine that cargo residues in the cargo tanks would be safe in the presence of fire. In this case, the critical determination to be made was not necessarily the name of the cargo or product, but rather, whether the space inspected and tested was "safe for fire." Mr. Holt certified that the cargo tanks were safe for fire. Furthermore, the evidence suggests that Oil Transport was not given an opportunity to review the marine chemist's certificate until after the fire occurred.

B. Holt Laboratories and American Marine

1.

The plaintiff's cause of action against Holt Laboratories arises under the general maritime law of torts.

2.

Prior to the commencement of any hot work on vessels, Coast Guard regulations require the issuance of a marine chemist's certificate verifying that hot work can safely be performed. 46 C.F.R. 33.01–1 and 91.50–1. These regulations require that the marine chemist comply with NFPA No. 306 in issuing the certificate.

**3.**

The certification "safe for fire" means that in the compartment so designated:

(a) the concentration of flammable materials in the atmosphere is below 10 percent of the lower flammable limit; and that

(b) in the judgment of the marine chemist, any residues in the compartment are not capable of producing a concentration higher than 10 percent of the lower flammable limit under existing conditions in the presence of fire and while maintained as directed on the chemist's certificate; and that

(c) all adjacent spaces have either been cleaned sufficiently to prevent the spread of fire, are satisfactorily inerted, or, in the case of fuel tanks, have been treated as deemed necessary by the marine chemist.

NFPA No. 306, Chapter 1–5.2.

**4.**

■ Mr. Holt's failure to perform any tests on the residue in the cargo tanks was negligent. It was also negligent for Mr. Holt to certify that cargo tank number two was safe for fire when, in fact, all adjacent spaces in this tank obviously had not been cleaned sufficiently to prevent the spread of fire. However, this negligence was not the proximate cause of the accident.

**5.**

Under 29 C.F.R. § 1915.10, shiprepair yards are required to have a designated "competent person" to continually monitor the safety of all repair operations. This person receives special training and, among other things, he must be capable of performing inspections and various atmospheric tests to determine the presence of chemical gases or vapors. 29 C.F.R. §§ 1915.11 through 1915.40 and 1915.71 through 1915.-76. However, American Marine did not have such a "competent person" supervising the repair work on the BAYOU TECHE.

Mr. Peter Durant, the American Marine engineer and naval architect whose decision it was to repair the old insulation on the BAYOU TECHE, testified that he is not a "competent person" either. He also testified that he did not contact Mr. Holt, and thus did not get a new certificate from Mr. Holt when he decided to do the hot work on the old insulation.

Mr. A.J. Scardino, an expert in industrial safety with a particular expertise in shipyard repair as a competent person, testified at trial. Mr. Scardino is a university instructor of industrial safety and has expertise in training and designating "competent persons" for shipyard work. He testified unequivocally that no competent person would allow hot work to be done directly on insulation such as that involved in this case; the competent person would remove the insulation and clean the area thoroughly. Mr. Scardino's testimony was both formidable and convincing.

■ It was clearly negligent for American Marine not to have a "competent person" supervising the repair work, and this negligence was the sole, efficient, producing cause of the plaintiff's injury. *Chisolm v. Sabine Towing & Transportation Co., Inc.,* 679 F.2d 60 (5th Cir. 1982). The evidence clearly supports a finding that the accident would not have occurred if a competent person had been present, because hot work directly in contact with the old insulation would not have been permitted. Although Mr. Holt was negligent in failing to inspect the BAYOU TECHE properly, American Marine's failure to have a competent person controlling the repair operations constitutes superseding negligence and the proximate cause of the plaintiff's injuries. Restatement of Torts 2d § 452(2).

**6.**

■ The plaintiff was not contributorily negligent. Given the exigent circumstances in which he found himself when the fire broke out, he acted reasonably in fleeing the vessel in the manner in which he did.