**Philip C. WILD, Jr., et al.**

v.

**LYKES BROTHERS STEAMSHIP CORP.**

**Civ. A. No. 78–1679.**

United States District Court, E.D. Louisiana.

June 2, 1983.

Harold J. Lamy, New Orleans, La., for plaintiffs.

John A. Bolles, New Orleans, La., for defendant.

## ORDER

McNAMARA, District Judge.

This matter came on for trial on a former day and was taken under advisement. Now, after hearing the evidence and considering the argument and memoranda of the parties, the Court rules as follows.

The issue in this case is whether the presence of an observation platform, which is itself not dangerous, but which is designed in such a way to facilitate its conversion into an unsafe ladder, constitutes ship negligence under Section 905B of the Longshoremen and Harbor Workers' Act. The issue arises in the following context.

In May of 1977, pursuant to contract, the DOCTOR LYKES, owned by Defendant, Lykes Brothers Steamship Corporation

(Lykes), underwent extensive repairs by Dixie Welding and Metal Works, Inc. (Dixie). The DOCTOR LYKES is an oceangoing vessel which can load and discharge barges with containerized cargo by use of a vessel elevator deck.

Repairs began on May 20, 1977, and were completed about July 1, 1977. On a typical day in excess of 200 Dixie employees were working per shift. These included various crafts such as pipe fitters, machinists, boiler makers and laborers. Plaintiff was one of 20 to 40 boiler makers on board per shift. The evidence reflects that for all practical purposes, the entire vessel was turned over to Dixie for repairs. The only Lykes employees on board were the captain and a port engineer. Their responsibility was limited to seeing that the overall repairs were completed in accordance with plans and specifications.

Plaintiff first reported to this job on May 23, 1977. A Dixie foreman assigned Plaintiff's duties. His initial duties (for 1½ days) consisted of miscellaneous repair work on the aft end of the vessel and in the vessel's pump room. While performing these initial duties in the pump room, Plaintiff had need for a ladder and was told by his foreman that some ladders were being brought to the vessel from Dixie's shop which was only a short distance away. In the interim, he borrowed a ladder from Lykes and had no problems. Plaintiff's next duties required him to descend to an elevator deck, which at the time of Plaintiff's accident was in its stowed position approximately 5 to 6 feet below the main deck. The elevator deck, was, when operating, used to lift and lower barges containing cargo. To descend from the main deck to the elevator, Plaintiff utilized a "ladder" which had been placed in position by someone else whose identity is unknown. This "ladder", which Plaintiff utilized to descend to the elevator deck, was in reality a configuration of pipes which formed the perimeter safety guard of a small observation platform located on the main deck. This observation platform would enable one to have an unobstructed view of the elevator deck during loading and unloading operations. (See Photographs P1–P15). This device was designed in such a manner that its vertical stanchions could be unbolted from the main deck of the vessel and the entire mechanism rotated between 90 and 180 degrees. In this position, the mechanism became a "ladder" its vertical stanchions having been converted to a handrail and its horizontal sections having been converted to "ladder" rungs. This device also contained an additional two steps to the "ladder" which rested on the elevator deck below. These bottom two steps of the converted "ladder" appear to serve no purpose when the device is being used for its primary purpose as a perimeter protection for the observation platform. For this reason, I find that the mechanism in question was purposefully designed to be used in two ways. Its primary use was as a perimeter guard for the observation platform, and its secondary use was as a ladder from the main deck to the elevator platform if the elevator was positioned either in its stowed position or at any level approximating the stowed position.

I further find that when the device is converted to a ladder, it is defective and unreasonably dangerous for several reasons; its handrails do not extend the full length of the ladder, its rungs are not non-skid but instead smooth, round pipe and it is unsturdy.

While descending this "ladder" Plaintiff was injured when he slipped and fell. The cause of him slipping and falling was grease on the ladder rungs, and on his shoes, movement of the ladder and the absence of a handrail at the lower end of the ladder.

Prior to Plaintiff's injury, he had used the "ladder" a few times each day for several days and observed its unsafe condition. Prior to the accident, he had remarked to himself "who the hell put this here" but complained to no one else. After the accident, he told a co-worker that he had "slipped on that greasy mickey mouse ladder".

I find that Plaintiff has not proved whether or not at the time control of the vessel was relinquished to Dixie for repairs, on or about May 20, 1977, the mechanism in question was in the converted position for use as an unsafe "ladder" or whether at that time it was in its primary position for use as a perimeter guard for the observation platform. There is simply no evidence as to who placed the mechanism in its converted ladder position and insufficient evidence as to when this conversion took place, though it did take place before Plaintiff began work on the vessel on May 23, 1977.

Dixie's foreman testified that had he been advised of the unsafe "ladder", he would have replaced it with a gangway owned by Dixie and located in Dixie's warehouse one block away. Indeed, after Plaintiff's accident, a Dixie gangway was installed in place of the unsafe ladder.

Unlike *Pluyer v. Mitsui OSK Lines, Ltd.*, 664 F.2d 1243 (5th Cir.1982), Plaintiff has not proven Defendants in the case at bar took any affirmative action in furnishing the ladder in question. In fact, Plaintiff has not proved by a preponderance of the evidence that any Lykes employees were aware that the mechanism was being utilized as a ladder at the time of Plaintiff's accident.

Had Plaintiff proved that the mechanism in question was in its position as a defective ladder at the outset of the Dixie operation or that the Lykes employees knew or were chargeable with knowledge of the fact that someone, the identity of whom is unknown, converted the mechanism to an unsafe "ladder" during the operation and further knew that Dixie was exercising improvident judgment in using the defective ladder, the elements of *Scindia Steam Nav Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1, would be met and the vessel owner (Lykes) might have a duty to intervene. In this case, none of these elements have been proven. The record simply doesn't reflect who converted the mechanism to an unsafe ladder, when it was done or whether or not any Lykes personnel were aware that the mechanism was being used in that manner.

Though there was some testimony by Plaintiff's co-employees that the elevator deck in question could only be moved by Lykes personnel, that is, Dixie personnel were not permitted to lower or raise the elevator deck, I don't find that that limitation equates to the elevator deck area remaining under the control of Lykes. In fact, much of the work that Dixie was performing was in the area of the elevator deck and indeed the duties of Plaintiff himself involved that work area. Furthermore, to the extent that Lykes retention of the operation of lowering or raising the elevator deck bears on the issue of the control of that work area, it should be noted that Plaintiff has not proven that the elevator deck in question was raised or lowered during the repair operation and it may have been in its stowed position since the beginning of work by Dixie. Thus, unlike *Walker v. The Blacksea SS Co.*, 637 F.2d 287 (5th Cir.1981), the work area in the case at bar was controlled by Dixie.

In summary, the duties owed by Lykes to Plaintiff in this case:

"The first is a duty to exercise ordinary care to have the vessel and its equipment in such a condition that a reasonably cautious expert stevedore can carry on its operations with reasonable safety. The second is a duty to inform the stevedore of any hazardous conditions aboard the vessel as regards its equipment, that are either known to the vessel owner or should have been known to it in the exercise of ordinary care, that are likely to be encountered by the stevedore in the exercise of its cargo operations and that are unknown to it and would not otherwise be self-evident or expected by it if it displays an acceptable level of competence while doing its work." *Stass v. American Commercial Lines, Inc.*, 683 F.2d 120, 121 (5th Cir.1982)

were not breached by Lykes.

Accordingly, Plaintiff's suit must be and it is DISMISSED at his costs.

The above Order will serve in lieu of Findings of Fact and Conclusions of Law.