Tommy T. **GRAHAM**

v.

**STAUFFER CHEMICAL COMPANY, et al.**

Civ. A. No. 83–560.

United States District Court, E.D. Louisiana.

May 15, 1984.

Robert E. Kleinpeter, Baton Rouge, La., for plaintiff.

Clayton Ramsey, New Orleans, La., for defendant.

BEER, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

1. On April 26, 1982, the SJT–165, a salt barge owned by defendant, St. James Transportation Company, Inc. (St. James), was transported to a dock owned and operated by defendant, Stauffer Chemical Company (Stauffer), located on the Mississippi River at Mile 199.9. Stauffer had contracted with St. James for the periodic delivery of salt which was to be used by Stauffer in the production of chlorine.

2. Stauffer arranged to have these salt barges unloaded by Bulk Marine Contractors (Bulk Marine), a stevedoring company

owned and operated by Tommy J. Graham. Stauffer supplied and maintained an American hoist and derrick crawler crane on its dock which was used almost exclusively by Bulk Marine to discharge the salt. The arrangement between Stauffer and Bulk Marine was that Stauffer would be responsible for major maintenance required on the crane but that Bulk Marine was required to complete monthly inspection reports outlining the condition of the equipment and was to recommend any necessary repairs.

3. The crane itself was set upon rails which allowed it to traverse the entire length of Stauffer's 400-foot dock. It was equipped with a six-ton clam bucket suspended from the end of a seventy-foot boom which facilitated the removal of salt from the barges when they were tied up to the dock.

4. The usual procedure for unloading a salt barge was as follows: Once the barge was brought alongside the dock, the Bulk Marine crew would bring the crane adjacent to the barge and remove its covers. If the barge was equipped with roll top, telescoping covers, this was achieved by centering the crane's clam bucket directly over the cover to be moved, attaching two fourteen-foot steel cables to padeyes on each side of the cover, and then either "walking" the crane down its tracks on the dock using the weight of the clam bucket to roll the cover, or swinging the boom of the crane to roll the cover.

5. On April 26, 1982, Bulk Marine had a three-man crew unloading a St. James barge. The crew consisted of Tommy J. Graham, as supervisor, and two of his sons, Lenn (Pete) Graham, who was operating the crane, and Tommy T. Graham, the plaintiff, who was working on the deck of the barge.

6. At the time this accident occurred, Lenn Graham and the plaintiff had finished unloading one-half of the barge and were in the process of moving the covers to expose the remaining salt. The SJT–165 had roll-top covers and the plaintiff was on the deck of the barge hooking the straps from the bucket to the covers so that his brother, Lenn, in the crane could roll them away. Plaintiff had connected the straps to one of the covers and was attempting to get off the cover and onto the deck of the barge when the crane swing gear suddenly engaged, rotating the boom, pulling the cover off of its rails, and dumping both the cover and the plaintiff into the barge. Plaintiff broke his left ankle as a result of the fall.

7. The question of legal liability to be addressed by the Court turns on the factual determination as to what caused the crane to unexpectedly engage in its swing mode. Plaintiff contends that his injuries were caused either by Stauffer's negligence in failing to properly maintain the crane, or in St. James' negligence in supplying a barge with defective hatch covers, or a combination of the two. Defendants contend that the accident was caused solely by the negligence of Bulk Marine Contractors and its employees.

8. Plaintiff's father, Tommy J. Graham, was supervisor of the Bulk Marine crew and testified that on occasions, the crane would jump without the swing lever having been engaged by the operator. When questioned regarding these occurrences, Mr. Graham stated, however, that he could not be sure that he had not engaged the swing lever accidentally. Mr. Graham also testified that it was his opinion that this jerking was related to the worn condition of the swing brake friction drum. In direct conflict with this testimony, however, are two monthly inspection reports prepared by Mr. Graham which indicated that for two months prior to plaintiff's accident, the swing brake friction was found to be "O.K."

9. A roll-top barge such as the SJT–165 is designed with a twin set of rails which parallel the cargo compartments of the barge. The large covers on the barge ride on the outer rails and the small covers on the inner rails. Just inboard of the inner rail is a coaming which forms a lip around the cargo hold. In order for the large cover, which plaintiff was on top of at the

time of this incident, to fall into the hold, it would have to clear both sets of rails and the hatch coaming—a vertical distance of approximately four feet. This would require a substantial amount of force in both a vertical and a horizontal direction.

10. None of the witnesses who testified as to the crane's alleged malfunctioning stated that in addition to a sideways jerking motion, the crane also jerked in an upward fashion.

11. Lenn Graham, operator of the crane at the time of his brother's accident, testified that the crane had jerked or jumped on him on prior occasions, but that at no time did this jerking result in more than three to four feet of movement of the boom tip. He also stated that the machine's tendency to jump must have caused the plaintiff's injuries because, although he had his hand on the swing lever at the time of the accident, he did not recall engaging it at that time. In any event, he again stated that the boom moved only three to four feet to the side and that the clam bucket did not move past the boom, i.e., it did not move more than three to four feet.

12. Fred Liebkemann, Stauffer's mechanical engineering expert, witnessed an unloading procedure basically similar to that which took place when the plaintiff was injured. He testified that during this observation he watched barge covers being rolled in the same fashion as had previously been used by the Bulk Marine crew. He noted that before the covers would even begin to move, the boom of the crane had to be moved in excess of ten feet so as to create enough momentum for the clam bucket to actually begin exerting pressure on the barge covers.

13. Plaintiff's expert engineer, Mr. Percy Miller, stated that the crane's tendency to jerk might have been caused by the fact that the swing friction drum was out of round and would occasionally grab causing the boom to shake. This problem, however, resulted in no more than a foot of movement at the end of the boom.

14. Additionally, the Stauffer crane had been examined by Mr. Frederick Blount who, approximately one month prior to the accident, conducted the United States Department of Labor Occupational Safety and Health Administration annual inspection of the crane. The crane met all OSHA mechanical requirements at that time.

15. Turning now to the issue of the condition of the SJT–165's rolling covers, it was the testimony of Tommy J. Graham that some of the barge's covers were difficult to move, but that this was not unusual in that many of the barges that his crew encountered at the Stauffer dock presented a similar stevedoring situation. Lenn Graham testified that he had noticed that some of the cover wheels were off the track and some of the covers were slightly bent, but he could not recall the condition of the cover involved in the accident. In short, none of the witnesses present at the time of the accident testified that the cover which fell into the barge was off its rails or, in any way, defective.

### Conclusions of Law

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1333 and 33 U.S.C. § 905(b).

2. Plaintiff's action against St. James arises from Section 905(b) of the Longshoremen's and Harbor Workers' Compensation Act which provides, in pertinent part, as follows:

> In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third-party in accordance with the provisions of Section 933 of this title.... 33 U.S.C. § 905(b).

3. The current law in connection with a stevedore's injury aboard a vessel was set out by the United States Supreme Court in *Scindia Steam Navigation Company, Ltd. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). In that case, the Supreme Court broadened the areas of immunity of a vessel owner in steve-

doring-cargo cases and held that the primary responsibility for the safety of a longshoreman rests upon the stevedore. As stated by the Court:

> As a general matter, the shipowner may rely on the stevedore to avoid exposing the longshoreman to unreasonable hazards... The ship is not the common employer of the longshoremen and owes no such statutory duty to them. Furthermore, as our cases indicate, the stevedore normally warrants to discharge his duties in a workman-like manner; and although the 1972 Amendments relieved the stevedore of his duty to indemnify the shipowner for damages paid to longshoremen for injuries caused by the stevedore's breach of warranty, they did not otherwise disturb the contractual undertaking of the stevedore nor the rightful expectation of the vessel that the stevedore would perform his task properly without supervision by the ship. *Id.*, 101 S.Ct. at 1623–24.

■ 4. Despite the broad immunity set out by the Supreme Court in *Scindia, supra*, the Court specified certain specific situations in which a vessel owner may have a duty toward a longshoreman, a breach of which will result in a finding of negligence on the part of the vessel owner. One of these situations pertains to the condition of the vessel at the time it is turned over to the stevedore and is, therefore, appropriate for our consideration of the case at bar. This section reads as follows:

> The vessel owner must exercise care to deliver to the stevedore a safe ship with respect to gear, equipment, tools and work space. In discharging this duty, however, the owner is entitled to rely on the stevedore's performance of its task with reasonable competence and care for the safety of its cargo operations and employees. 101 S.Ct. at 1624.

■ 5. Plaintiff's two allegations against St. James deal with alleged duties to warn. Plaintiff contends that St. James was negligent in failing to warn the plaintiff and operator that the wheels and track mechanism on which the covers roll were out of line and that the covers themselves were bowed and bent. The duty to warn is set out and analyzed in *Scindia* as follows:

> This duty extends at least to exercising ordinary care, under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able, by the exercise of reasonable care, to carry on its cargo operations with reasonable safety to persons and property, and to warning the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work. 101 S.Ct. at 1622.

■ 6. Applying these guidelines to the facts presented by the testimony at trial, the Court concludes that the plaintiff has failed to meet its burden of proof as against defendant, St. James. First and foremost, the evidence presented by the plaintiff is insufficient to support the conclusion that the alleged defect in the barge's cover existed. Lenn Graham and the plaintiff testified that the barge had covers that were difficult to roll, but both candidly stated that they could not specifically recall that the cover which fell into the barge was defective in any way.

7. Even if we assume that the cover was defective, however, the duty to warn of such a defect did not arise on the part of St. James.

Tommy J. Graham testified that it was not uncommon in their business to unload barges with covers which were damaged in some way. All three employees of Bulk Marine stated that it was common practice to remove damaged covers by lifting them off the barge with the crane and placing them out of the way instead of rolling them to one end of the barge. Since all three stevedores admitted knowledge of this well-accepted practice, the defects alleged

can hardly be classified as hazards which "would not be known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work" such as to allow the duty to arise. No evidence was presented at trial that the stevedores would be unable "by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property". As previously stated, plaintiff does not carry its burden of proof in establishing the negligent condition of the vessel. However, even had such condition been proved, the duty to warn of such conditions never arose on the part of St. James. To hold that such a duty exists in a situation in which the defect alleged is one frequently encountered by stevedores in the course of the performance of their duties, and one in which there is a commonly accepted practice to perform the operation safely without risk to persons or property, would be to extend the shipowner's exposure far beyond the limited exceptions of vessel liability intended and set out by the court in *Scindia, supra.*

8. Plaintiff's claim against Stauffer is based in negligence for failure to properly maintain its crane. Because plaintiff was not a seaman and Stauffer was not the shipowner nor his employer, plaintiff's action against Stauffer is grounded in general maritime law principles and the duty owed by Stauffer is the usual negligence standard of reasonable care under the circumstances. *Melerine v. Avondale Shipyards,* 659 F.2d 706 (5th Cir.1981).

9. Once again, the Court must reach the conclusion that plaintiff's evidence is insufficient to establish that Stauffer is liable for plaintiff's injuries. Legal cause is the proper standard to be applied to causation questions in maritime tort cases. The elements of legal cause are negligence, causal connection between the negligence and the injury, the invasion of a legally protected interest and the lack of a countervailing legally protected interest as a defense. *See, e.g., Spinks v. Chevron Oil Company,* 507 F.2d 216 (5th Cir.1975).

10. The alleged negligence was Stauffer's failure to properly maintain its crane. The resulting defect in the machinery was a swing friction drum that was out of round and had a tendency to grab causing the boom to shake or vibrate. Both plaintiff's and defendant's expert mechanical engineer testified, however, that this defect resulted in no more than about a foot of horizontal movement at the end of the boom. These same experts also testified that in order for the barge cover to fall into the hold, it would first have to be lifted vertically over both sets of rails and the hatch coaming—a distance of about four feet. There was no evidence presented by any individual that a defect in the crane caused it to move upward, as well as sideways. The inescapable conclusion is that the crane's tendency to vibrate on occasion was in no way causally connected to plaintiff's injuries which resulted when the barge cover on which he was standing was lifted four feet up and swung ten to twelve feet over before tumbling into the hold. The evidence presented by plaintiff was inadequate to show that Stauffer failed to use reasonable care for the plaintiff's safety.

In view of the foregoing reasons, plaintiff's suit is hereby dismissed. Counsel for defendants will submit a judgment consistent with the above.