Mabel BECKWITH, as Administratrix of the Estate of Wilbert Beckwith, deceased, Plaintiff,

v.

SANKO KISEN K.K., Defendant.

Civ. A. No. 2:84–3171–1.

United States District Court, D. South Carolina, Charleston Division.

March 3, 1987.

Arnold S. Goodstein, North Charleston, S.C., and Harold Rosen, Fields & Rosen, New York City, for plaintiff.

Gordon D. Schreck, Charleston, S.C., for defendant.

## ORDER AND JUDGMENT

HAWKINS, District Judge.

This matter is before the court on defendant's motion for summary judgment filed September 12, 1986. Oral arguments were heard January 5, 1987. This court has since reviewed the memorandums of counsel and the applicable law and is of the opinion that the motion should be granted.

This is a suit brought by the Administratrix of the Estate of Wilbert Beckwith (hereinafter "Beckwith"), seeking recovery for Beckwith's alleged wrongful death while working for Carolina Shipping Company (hereinafter "Carolina") as a longshoreman discharging cargo from defendant's vessel PALMSTAR SUMIDA on February 16, 1984, at Union Pier Terminal, Charleston, South Carolina. Based upon the record in this case, the defendant moves for summary judgment on the ground that there is absolutely no evidence whatsoever to support the plaintiff's allegations of negligence on the part of the shipowner.

The issue in determining a motion for summary judgment is whether there exists a genuine issue of material fact. Fed.R. Civ.P. 56.

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of

the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corporation v. Catrett,* —— U.S. ——, ——, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Though this initial responsibility rests with the moving party, when a motion for summary judgment is made and supported as provided in Rule 56, the non-moving party must produce "specific facts showing that there is a genuine issue for trial," rather than resting upon the bald assertions of his pleadings. Fed.R.Civ.P. 56(e); *see Celotex,* —— U.S. ——, 106 S.Ct. 2548.

Thus,

the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex,* —— U.S. ——, 106 S.Ct. at 2252–53.

The question of the moving party's liability in this case is governed by Section 5(b) of the Longshoremen's and Harbor Workers' Compensation Act, as amended in 1972 (hereinafter "LHWCA"), 33 U.S.C. § 905(b), which, *inter alia,* abolished unseaworthiness, an historic ground for recovery under the Act, and limited a shipowner's liability to an injured longshore-

man to "negligence of a vessel." 33 U.S.C. § 905(b). The 1972 Amendments were intended to make a shipowner liable only for its own negligence, relieving it of liability for the negligence of those engaged in providing stevedoring services. As the Supreme Court noted, "Congress intended to make the vessel answerable for its own negligence and to terminate its automatic faultless responsibility for conditions caused by the negligence or other defaults of the stevedore." *Scindia Steam Navigation Co., Ltd. v. De Los Santos,* 451 U.S. 156, 168, 101 S.Ct. 1614, 1622–23, 68 L.Ed.2d 1 (1981). As a *quid pro quo* for depriving the longshoreman of his previously-allowed remedy based on seaworthiness, Congress in the 1972 Amendments substantially increased the compensation benefits payable to a longshoreman from his employer for injuries incurred in the course of his employment.

Accordingly, the single legal issue to be resolved here is whether there is any evidence to create a material issue as to whether the defendant, Sanko Kisen K.K. (hereinafter "Sanko"), committed any breach of the standard of care for a shipowner set forth by the Supreme Court in the *Scindia* opinion. In that landmark case, a longshoreman was injured when a winch, which was a part of the ship's gear, malfunctioned. At the time of the accident, a loading operation had been going on for two days and the winch had been malfunctioning throughout this period. Faced with these facts, as well as the legislative history of the LHWCA and its amendments, the Supreme Court enunciated a three-fold standard of care applicable to the vessel owner/longshoreman relationship. First, the vessel owner must

exercis[e] ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and [warn] the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or

should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work. *Id.*, at 416, n. 18, 89 S.Ct., at 1151, n. 18.[1] The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools and work space to be used in the stevedoring operations; and if he fails at least to warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshoreman.

*Scindia* at 167, 101 S.Ct. at 1622. Secondly,

the vessel may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation.

*Id.*

█ Finally, the court held that "the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore," *id.* at 172, 101 S.Ct. at 1624; but if the shipowner has actual knowledge that an apparently dangerous condition exists or has developed in the cargo operation, and a reasonable belief that the stevedore will not or cannot remedy that danger, and that the longshoremen cannot avoid it, the shipowner has a duty "to take steps, reasonable in the circumstances, to eliminate or neutralize the hazard." *Id.* at 175, 101 S.Ct. at 1626.

As shown by the pleadings on file and the testimony of the witnesses, the relevant facts in this suit are not in dispute. Thus, applying the *Scindia* standard to these facts, it is clear that no material issue exists as to whether Sanko breached its duty of care to Beckwith. The facts show that Carolina was employed by Sanko to discharge cargo from the PALMSTAR SUMIDA on February 16, 1984. Discharging operations commenced at approximately 0800 hours that morning under the supervision of William Welch (hereinafter "Welch"), Carolina's stevedore foreman.

At the time of the incident in question, Beckwith was on board the PALMSTAR SUMIDA working in cargo hold No. 3 as a longshoreman in the employ of Carolina.

Prior to commencing the discharge operation, Welch made a visual inspection of the ship, including the cargo hatches which were to be worked, including the No. 3 hatch where the incident occurred. Based on Welch's visual inspection of the condition of the cargo in stow in Hatch No. 3, the stowage "appeared to be good."[2] Even John Memminger (hereinafter "Memminger"), a fellow longshoreman who was working with Beckwith in cargo hold No. 3 on the date he was injured and also claimed that the surface of the plywood crates in stow was somewhat uneven, acknowledged in his deposition that he was aware of the condition of the stow in the No. 3 hold of the PALMSTAR SUMIDA from the commencement of the cargo operations and that said condition was normal for ships carrying this type of cargo.

In addition to his visual inspection of the cargo hatches, Welch also undertook to check the condition of the ship's cargo cranes by inspecting the ship's machinery records to ensure that maintenance had been carried out on a regular basis.

The particular cargo being discharged from the No. 3 hatch at the time of the accident consisted of rectangular crates of plywood, also referred to as "corestock."

---

**1.** *Marine Terminals v. Burnside Shipping Co.*, 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969).

**2.** *See* Welch's deposition, p. 9.

The plywood crates were lifted from the ship's cargo hold in drafts or stacks of twelve (12) crates at a time, utilizing braided wire straps secured to a "spreader" bar, which, in turn, was hooked to the ship's crane. The braided wire straps and spreader bar belonged to Carolina. It was Carolina who selected the method and equipment for discharge.

To facilitate the stacking of the heavy crates of plywood in the ship's hold preparatory to lifting them out with the wire straps, Carolina placed a bladed forklift in the No. 3 hold, along with tin floor plates to be used as a working surface for the forklift. The procedure was for the forklift operator, Barry Dunham (hereinafter "Dunham"), to stack three (3) stacks of four (4) crates each together on 3 × 4 or 4 × 4 wood stringers placed on one of the tin plates and then have Beckwith and several fellow longshoremen in the hold place the wire straps under the bottom end corners of the stacks, so that the entire draft of twelve (12) crates could then be lifted out of the ship's hold by the Carolina longshoreman operating the ship's crane.

At the time of the accident, Dunham had just finished stacking the twelve (12) crates of plywood and Beckwith and his fellow workers were in the process of placing the wire straps under the corners of the crates. While there is some discrepancy as to the exact sequence of events which immediately preceded the toppling of several crates of plywood, at least one of which struck Beckwith, the deposition testimony of the witnesses is consistent and clear that the sole proximate cause of the crates falling was the action of the forklift operator. According to Dunham, who was operating the forklift, all of the crates had been stacked in position, but the longshoremen were having some difficulty securing one of the braided straps under one corner of the crates. Dunham testified that he used the blades of the forklift to lift that corner of the crates slightly so as to enable the longshoremen to get the strap under it, and when he did, several of the crates on the top of the stack fell over. Dunham testified that he did not move the forklift from the position it was in when the crates fell, and certain photo exhibits submitted in support of Sanko's summary judgment motion show the blades of the forklift under the bottom crate in the stack nearest the forklift. It was Memminger's recollection, as testified to in his deposition, that as he observed the operation from the main deck above, it appeared that the last two (2) crates which Dunham had placed in the stack fell over as the forklift "backed away."

There had been no complaints made by the stevedore to the ship's personnel prior to the time of the accident about any unsafe conditions or problems in the No. 3 cargo hold, nor had there been any complaints about any mechanical problems with the ship's cargo crane at the No. 3 hatch, or any work stoppages due to problems with the discharge. Welch testified that, as far as he could determine based on his own investigation of the accident immediately after its occurrence, no ship's personnel or equipment was in any way involved in the accident.

Based on the above undisputed facts, there can be no question that Sanko did not breach the first *Scindia* duty. All of the witnesses in the case, which include the two witnesses identified by the plaintiff as having knowledge of the accident, as well as the stevedore foreman who was supervising the discharge operation, testified consistently that neither the ship's gear nor any of its other equipment was involved in the incident which caused Beckwith's injuries. In addition, these same witnesses also testified that the conditions in the hold were open and obvious from the very commencement of the discharge operation.

Likewise, the facts do not indicate a breach of Sanko's second *Scindia* duty. The record clearly establishes that no portions of the vessel were under the active control of Sanko during the stevedoring operation. Furthermore, Sanko did not retain active control over the cargo operation. Case law establishes that such control must have been over the actual methods of

work used by the independent contractor and the operative detail. *Cowsert v. Crowley Maritime Corp.*, 680 P.2d 46, 101 Wash.2d 402 (1984). The record shows that it was Carolina, and not Sanko, who selected the method, personnel, and equipment for discharge. Since such control is the *sine qua non* of the second *Scindia* duty, no such obligation was owed to Beckwith by Sanko.

Realizing that any liability on the part of Sanko can only be premised on the third *Scindia* duty, the plaintiff argues that the stevedore could only discharge the cargo by working on an inherently dangerous surface. Specifically, the plaintiff claims that the floor of the vessel in the cargo hold, as well as the tin plates covering the plywood crates, were uneven and unbalanced.[3] The existence of such a working surface, so the plaintiff's argument goes, was a dangerous condition which the stevedore was unable to remedy. Accordingly, it is the plaintiff's position that such a condition can give rise to liability against the shipowner as was found by the Fourth Circuit Court of Appeals in *Gill v. Hango Ship-Owners/AB*, 682 F.2d 1070 (4th Cir. 1982).

This court disagrees. In *Gill*, the plaintiff longshoreman was injured during the unloading operation when a breakout clamp, placed on the end of a roll of paper by the plaintiff, slipped off the roll while it was being hoisted from the vessel's hold. The clamp struck the plaintiff, causing the injuries for which he sued the shipowner in negligence under the LHWCA. The United States District Court for the District of Maryland ultimately granted summary judgment in favor of the shipowner, and the plaintiff appealed. On appeal, the Fourth Circuit noted that

> [a]n expert witness for the plaintiff, ... whose qualifications as an expert [were] not in question, [had] made affidavits to the effect that the rolls of paper could not be unloaded without employing tong-

like breakout clamps, so that the use of such clamps was inevitable, and that such clamps were inherently dangerous. *Id.* at 1071–72. Based on these affidavits, the court held that there was evidence in the record that "the manner in which the cargo was stored precluded the stevedore from unloading it by any other means except one which was inherently dangerous [to nearby personnel such as the plaintiff.]" *Id.* at 1074. For that reason, the Fourth Circuit remanded the case to the district court on the grounds that genuine issues of fact remained as to whether the shipowner should have anticipated the harm because the stevedore was unable to remedy the dangerous condition, and whether such shipowner should have intervened to stop the loading operation until it could be done with reasonable safety. *See id.* at 1075.

Unfortunately for the plaintiff, however, the *Gill* case is distinguishable from the case at bar. In this action, the record before the court is completely devoid of any evidence that the discharge method employed by the stevedore was dangerous or that the existence of an uneven work surface was an inherently dangerous condition. To the contrary, all of the witnesses in the instant action have testified in their depositions that the conditions of the stowage in Hatch No. 3 on February 16, 1984, was normal and in good order. Furthermore, their testimony equally establishes that they were fully aware of the existence of some uneven plywood crates and that the stevedore suitably evened out the working surface through the use of tin floor plates. Succinctly stated, the only evidence before this court is to the effect that the condition of the cargo was normal and that the stevedore engaged in a perfectly ordinary and customary method of discharge. For these reasons, it is clear that *Gill* does not apply to the present case.

Likewise, for the very same reasons that the *Gill* case is inapplicable, this court further concludes that it is beyond dispute

---

3. The plaintiff's claim that the floor of the vessel itself was uneven is clearly erroneous. Instead, the record shows that the "uneven floor" re-

ferred to by the plaintiff was, in fact, the uneven surface of the plywood crates in stow.

that Sanko did not breach the final *Scindia* duty.

 In summary, there is absolutely no evidence to even remotely suggest any involvement on the part of the ship or the ship's personnel in connection with the incident resulting in Beckwith's death. To the contrary, all of the testimony and exhibits are consistent in establishing beyond any doubt that this unfortunate incident was caused by the operational negligence of the stevedore's longshore employees, including the decedent himself. Thus, while this court sympathizes with the plaintiff's circumstances, it is clear that the shipowner cannot be held liable to the plaintiff under Section 905(b) of the LHWCA as a matter of law.

For the foregoing reasons, therefore, it is

ORDERED, that judgment be, and the same is hereby, entered for the defendant, Sanko Kisen K.K., and this case is hereby dismissed.

AND IT IS SO ORDERED.