Alden CROCHET and Ruth Crochet

v.

ABC INSURANCE COMPANY, Scott Chotin, Inc. and XYZ Insurance Company.

Civ. A. No. 89–1892.

United States District Court,
W.D. Louisiana,
Lafayette–Opelousas Division.

Nov. 8, 1991.

Richard C. Broussard, Domengeaux & Wright, Lafayette, La., for plaintiff.

Timothy J. McNamara, Onebane, Donohoe, et al., Lafayette, La., for Scott Chotin.

Marc D. Moroux, Jeansonne & Briney, Lafayette, La., for Citgo Petroleum.

OPINION

TRIMBLE, District Judge.

Plaintiffs, Alden Crochet and Ruth Crochet, seek damages allegedly resulting from an accident that occurred on the evening of December 14, 1988 while Alden Crochet was employed by Citgo Petroleum Corporation as a pipefitter. One of Mr.

Crochet's duties was to connect flow lines on barges docked at Citgo's Lake Charles refinery to receive product from Citgo. Plaintiff's accident allegedly occurred on one of two barges owned by defendant Scott Chotin situated at Dock "A" of the Citgo facility. Plaintiffs bring this action under 33 U.S.C. § 905(b) predicated on alleged vessel negligence. The parties agree that at the time, Mr. Crochet qualified as a longshoreman and the barges were vessels within the meaning of the statute. Citgo Petroleum Corporation has intervened seeking reimbursement of Longshoremen and Harbor Workers Compensation benefits paid to the plaintiff, if plaintiff should recover in tort.

### Summary of Evidence

At the time this accident occurred two barges owned by Scott Chotin, Inc. (Chotin) had, at the direction of Citgo personnel, been docked abreast of each other parallel to "A" dock at about 7:00 P.M., during the hours of darkness. Citgo personnel informed the captain of the towboat pushing the barges that Citgo personnel would perform all connections, including crossover connections. Situated on each Chotin barge, in a location convenient for use in making the crossover (hose connection between the barges) was a hose boom for lifting and maneuvering the crossover hose and a padded hose sling for cradling the hose without damaging it while it was being moved with the booms.

Mr. Crochet was a member of a 4–man crew which was assigned by their superior to hook up the hoses from the loading dock to the barge nearest the dock and between the two barges. These barges were to receive oil from Citgo that had been heated to about 115 degrees Fahrenheit. The first connection was an 8–inch rubber hose that belonged to Citgo between the dock and the inside barge. Following that connection, the crew attempted to connect the hose between the inside and the outside barge. This was a flexible steel hose, 15–20 feet long, with an 8–inch interior diameter, and it had a braided stainless steel exterior. The Citgo crew found the crossover hose already connected to the header on the outside barge, so the only connection necessary was to bolt the swivel flange on the unconnected end of the hose to the header on the inside barge. The hose was lying on the surface of the barge deck, more or less straight out from the header on the outside barge, so it was necessary to bend the hose around into a "U" shape to make the connection. To accomplish this, the Citgo crew put a rope choker around the unconnected end of the hose and attached it to a cable which was in turn attached to a tugger situated on the dock. The tugger operated as a winch, pulling the loose end of the hose around toward the header on the inside barge.

The operation proceeded without incident until they attempted to bolt the swivel flange to the header, and because of a kink of some type in the hose, the swivel flange would not fit flush with the header flange. Mr. Crochet testified that although he had never before used a hose boom, he took one of the slings belonging to Chotin, put it under the hose at about mid-point, and used the hose boom on the inside barge to lift the hose about 3 inches off the floor. The flanges were still misaligned according to crew members Johnson and Gilmore, who were stationed at the header, and he thought he could solve the problem by raising the hose some more. To effect this, he grasped the underside of the hose with both hands and pulled upwards. As he did this, he supported the hose by flexing his knees and resting it on his legs between knees and thighs. As the hose was lowered onto his right leg, one of the wire filaments, referred at trial as a "wicker", pierced his trousers and entered his flesh. The pain and the weight of the hose caused him to sit down with the weight of the hose on his thighs above his knees, and as he gave way to the pain and the weight he testified that his left knee was twisted and he felt something pop.

Mr. Crochet described the wicker as being about 1 inch long. He had not noticed any protruding wires before this, but he had no difficulty seeing more of the wires sticking out of the bottom side of the hose after the accident. Although counsel for

plaintiffs attempted to prove deficient lighting a factor in this case, Mr. Crochet himself testified that lighting played no part in the accident and that he was able to see some wires like "kinky hair" on the bottom of the hose after this incident. Mr. Crochet testified that the wire that stuck him was sticking straight out. Mr. Crochet also testified that he did not look along the rest of the hose to determine whether there were any wickers.

■ As stated above, the court is convinced that light played no part in Mr. Crochet's accident and the court will focus on plaintiff's other claim that the hose was defective and defendant's crew failed to warn of any defect. Counsel for plaintiffs contends that stainless steel hoses were inappropriate *per se* and should not have been used. This contention has no merit. Based upon the testimony of Mr. William Oliver, Chotin's vice-president in charge of operations; Mr. Warren Jennings, a vice-president of American Hose and Hydraulics, and plaintiffs' witness, Charles A. Gilmore, the court finds that stainless steel hoses are quite appropriate and are commonly used in the industry. They have the distinct advantage over rubber hoses of being able to withstand much higher heat levels and are far more resistant to rupture. They are, however, more delicate, and require handling in accordance with manual specifications which were provided to the Citgo crew. These specifications, as well as Coast Guard regulations, prohibited dragging unsupported hoses across a nonskid deck or use of a single rope choke instead of a belt sling to support the hose. Mr. Crochet, as was every Citgo employee who testified, was totally unfamiliar with even the company's own manuals, much less the Coast Guard regulations, pertaining to hoses. Mr. Crochet had worked at this particular job for Citgo for some four years, where he himself testified that his main function was to connect and disconnect hoses on barges at the Citgo docks. He was unquestionably a member of the "dock personnel" to whom the manuals and regulations apply. The court was actually appalled at the virtual absence of training of the Citgo crew as to how to accomplish their dockside tasks. Mr. Crochet himself testified that even when connecting rubber hoses, and pulling them across decks, he had seen chunks gouged out of the hoses. Obviously, a steel hose should be handled with more care because of its comparative lack of elasticity. Crew members Gilmore and Johnson both testified positively that company policy forbade the use of barge equipment in handling the hoses. Billy Hampton, the cargo products inspector for Citgo in December of 1988, also testified that Citgo had to use its own equipment and not barge equipment in handling hoses. On the other hand, Mr. Carey McMillan, Citgo's shift supervisor who customarily directed Mr. Crochet, testified that if the barge boom was better, their men could use it. Mr. McMillan testified quite frankly that there was no set procedure for hooking up these hoses, and he had no problem at all with simply hooking the hoses to tuggers and pulling them around the decks, clearly in violation of company policy and Coast Guard regulations.

Mr. Crochet testified that he was wearing gloves when this incident occurred. He grasped the bottom of the hose with the gloves, and he did not testify that he had been stuck by any of the myriad wires that he claims that he later saw protruding from the hose. The testimony in this case establishes that protruding wires are common on stainless steel hoses with braided steel covers, even on some new ones. Even though the piece of stainless hose about a foot long that was brought to court did not have any such wickers, Mr. Jennings, who fabricates the hoses, states that they do exist. The testimony further establishes that people working with these hoses customarily wear gloves and long-sleeved shirts to prevent being pricked. Mr. Crochet's own experience attests to the effectiveness of gloves in preventing this type mishap.

As to the specifics of this case, whether Mr. Crochet was supposed to use barge equipment or not, his testimony established that he did in fact avail himself of a boom and sling to lift the hose off the deck. To lift it higher, all he had to do was operate

the crank on the boom. According to the manuals, he actually should have utilized the boom on the other barge as well, so that the hose would have been supported by two slings and kept off the deck while it was being turned to the proper position. The court heard the testimony of Mr. William D. Oliver, Sr., a vice-president for Chotin, and observed his explanation of the proper method of moving a hose. This would involve slipping the hose slings under the hose at two locations, and using the hose booms to lift the hose up, from which position it could be bent or maneuvered as needed. The court is convinced that although there may be some small portions of the hose in contact with the deck from time to time, there is far less chance of scraping or damaging the outer surface of the hose if it is supported properly than if it is simply dragged across a deck.

Counsel for plaintiffs insist that this hose resembled a porcupine because of the number of protruding wires. He quotes testimony of Herbert Johnson to that effect. Mr. Johnson describes wickers all over the hose and claims that he could not see them until daylight. However, he and Gilmore were left with the task of completing the hook-up, and they did so. Neither of them claimed to have been stuck by any of these numerous wires. He further stated that looking for the wickers was like "looking for a needle in a haystack." This testimony is directly contrary to the testimony of the plaintiff, Mr. Crochet, who stated that in the light available at the time, he could see the wires on the bottom of the hose plainly immediately after the accident. The court does not feel that the plaintiff has established that this hose was in any manner unsafe or unfit for its intended use.

Mr. Crochet testified unequivocally that he had never used a stainless steel hose with a braided cover as was the one involved here before the night of his accident. His fellow crew member, Mr. Gilmore, testified at the trial that some barges that they loaded used this exact type of hose and some did not. On deposition, he had testified that most of the barges had the stainless steel covered hoses. More

importantly, he testified that very frequently in working crossover hook-ups *with Mr. Crochet* they had used stainless steel hoses just like the one shown in defense exhibits 2-A, 2-B, and 2-H, which are the exact type involved in this case. Mr. Gilmore further testified that in handling these hoses, he had stuck himself from time to time with burrs and wires, and that this was not an unusual occurrence. Despite Mr. Crochet's testimony that he had never been stuck by a burr on a hose or even a burr on a cable the court finds that Mr. Crochet had in fact worked with these exact type hoses and that it is more probable than not that he had been stuck by wickers from them on more than one occasion.

*Applicable Law*

Defense counsel summarizes the duty owed by a shipowner to longshoremen from language in the case of *Scindia Steam Navigation Co. v. DeLos Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). Counsel for plaintiff does not take issue with this summary, and the court has read the case and finds that the language of the case supports defense counsel's synopsis, which is as follows:

(1) The shipowner must exercise ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety;

(2) The shipowner must warn the stevedore of any hidden dangers on the ship, or with its equipment, of which the shipowner is or should be aware in the exercise of reasonable care, that would likely be encountered by the stevedore, that are not known by the stevedore and that would not be obvious to or anticipated by him if reasonably competent in the performance of his work.

(3) Once stevedoring operations have begun, the shipowner is entitled to rely on the stevedore and generally owes

no duty to inspect or supervise the cargo operations or discover dangerous conditions that develop. However, if the shipowner learns that a hazardous condition exists and that the stevedore will not or cannot correct the danger and the longshoreman cannot avoid it, the shipowner has a duty to intervene in the operations to eliminate or neutralize the hazards.

As defense counsel points out, a shipowner has no duty to anticipate the action or inaction of a careless stevedore. *Polizzi v. M/V Zephyros II Monrovia,* 860 F.2d 147 (5th Cir.1988).

### Analysis of Law and Facts

Based upon the evidence in this case, the court cannot state that the hose with which Mr. Crochet was working was defective in any sense, even at the time of the accident. The evidence does not preponderate that its condition was such that its strength was in any way compromised, and the evidence from plaintiff and his own witnesses is quite contradictory as to just how many burrs or wickers were protruding from the hose. The court further finds that based upon the manner in which the hose was mishandled, there is a strong likelihood that many of the wickers were caused by the Citgo crew after they took control of the connection operation. This is so because if Mr. Crochet's testimony is believed, the wickers were situated at the *bottom* of the hose, where it had just been dragged over the non-skid surface of the deck. Chotin turned over to Citgo barges with appropriate booms and slings for the lifting and maneuvering of the hose without causing any strain or placing anyone in danger of being stabbed by a protruding wire. Mr. Crochet in fact utilized one sling and one boom. Rather than simply turning the crank to raise the hose higher, he succumbed to the seduction of precipitance and pulled the hose up on to his legs, a maneuver that could not and should not have been anticipated by any shipowner. The entire Citgo crew was woefully lacking in training concerning the proper method of handling hoses of all nature, and particu-

larly metal hoses which were common in the industry and common in use at the Citgo docks, and common in use by Mr. Crochet. There were no hidden dangers that would not have been obvious to or anticipated by the Citgo personnel if they had been reasonably competent in the performance of their work. The fault giving rise to this accident lies with Citgo in failing to properly train and equip its people and also with Mr. Crochet, who from prior experience must have known that braided steel exteriors had wickers. He had only to use the equipment at hand, provided by the shipowner, to avoid this accident.

In accordance with the above, the court makes the following findings of fact and conclusions of law:

### Findings of Fact

1) Plaintiff, Alden Crochet, on the evening of December 15, 1988, was working for Citgo Petroleum Corporation at its Lake Charles, Louisiana refinery as a pipefitter.

2) Mr. Crochet had been employed by Citgo as a temporary worker from 1967 until 1973, when he became a permanent Citgo employee.

3) About four years before December 15, 1988, Mr. Crochet was assigned to a crew whose primary responsibility was to connect and disconnect hoses on barges and other vessels moored at any of the four docks at the Citgo refinery utilized to load product from the refinery into vessels.

4) The nature of Mr. Crochet's work placed him in the category of "dock personnel" charged with the responsibility of knowing and following the instructions contained in the Citgo Operations Manual, the Citgo Safety Manual, and the Coast Guard recommendations with regard to handling of hoses on vessels.

5) The aforesaid instructional material required hoses to be supported with belt slings, not a single rope sling or choker, and further forbade the dragging of hoses over docks or decks.

6) Mr. Crochet was not cognizant of the proper procedure as specified in the man-

uals and Coast Guard recommendations with regard to the handling of the hoses, nor did Citgo properly train him in that regard; and further, Citgo did not provide its crew with appropriate equipment for the handling of hoses on vessels.

7) Defendant Chotin, at about 7:00 P.M. on December 15, 1988, at the direction of Citgo personnel, positioned two empty barges side-by-side at Dock "A" of the Citgo Lake Charles Refinery to be loaded with oil that was to be heated to a temperature of 115 degrees.

8) The Citgo crew of which Mr. Crochet was a member was ordered by the Citgo supervisor to make the connection of the hoses, including the crossover hose between the inner and outer barges. This was in accordance with the union contract between Citgo and the pipefitters union which called for all such connections to be made by Citgo personnel. When the Chotin barges arrived, the captain of the Chotin towboat was so informed.

9) Aboard both Chotin barges, properly situated to accomplish the task, were hose booms and hose slings for the handling of the crossover hose.

10) The crossover hose was made of flexible stainless steel, with a braided steel exterior, having an interior diameter of 8 inches and was approximately 15–20 feet long. The hose was already connected to the header on the outside barge when the Citgo crew started to make the connection with the inside barge.

11) Instead of immediately utilizing the slings and booms available, the Citgo crew, contrary to specific Citgo and Coast Guard instructions, hooked onto the loose end of the crossover hose with a rope choker and cable attached to a tugger situated on the dock and dragged the hose over the nonskid surface of the barge decks to cause the hose to bend in a "U" position and cross over from the outside barge to the header on the inside barge.

12) Because of a kink in the approximate mid-section of the hose, the Citgo crew experienced some difficulty in making the header connection on the inside barge. In order to make the flanges fit properly, Mr. Crochet finally availed himself of a hose sling and hose boom to lift the mid-section of the hose approximately three inches off the deck while two other crew members worked at the header. A fourth crew member remained at the tugger on the dock.

13) When the flanges still did not fit properly after the initial lift with the hose boom, instead of cranking the hose into a higher position, Mr. Crochet grasped the bottom of the hose with his gloved hands and lifted up on the hose. Because of the weight of the hose, he then flexed his knees and let the hose come to rest on his legs between his knees and his thighs.

14) As the hose came in contact with Mr. Crochet's right leg, a wire filament from the braided exterior of the hose, which apparently was sticking straight out, stuck Mr. Crochet's right leg causing him to give way and sit down with the hose resting on both his legs. In so doing, Mr. Crochet's left knee was twisted in some way.

15) Mr. Crochet, immediately after the accident, saw some other kinky strands of wire protruding from the surface of the hose and situated only on the bottom side in the area where he was working. The court finds that all circumstances considered, it is highly likely that the condition of the hose as observed by Mr. Crochet at that time was caused either wholly or in part by the mishandling of the hose in dragging it across the rough surface of the barges.

16) The use of braided steel hoses in the industry is quite common, and it is also not unusual and is common knowledge that the exterior of these hoses will have burrs or wickers, necessitating the wearing of protective gloves and long sleeved shirts. More specifically, despite his denial, the court finds that Mr. Crochet had worked with exactly this type hose before on frequent occasions along with fellow crew member Gilmore. The court further finds that more probably than not Mr. Crochet had encountered burrs and wickers, as had Mr. Gilmore, because they were a common characteristic of such hoses.

17) The Chotin barges were fitted with proper gear and equipment to accomplish the crossover safely by a properly trained crew wearing proper clothing. The hose itself presented no hidden hazard to a reasonably competent and attentive dock worker who had been properly trained in the method of moving hoses.

### Conclusions of Law

 1) In order for the plaintiff to recover in this case, it would be necessary for him to establish by a preponderance of the evidence that Scott Chotin, Inc., its agents or employees, were guilty of negligence causing injury to Mr. Crochet. 33 U.S.C. § 905(b).

2) A shipowner has the duty to exercise ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety. Further, a shipowner must warn the stevedore of any hidden dangers on the ship, or with its equipment, which the shipowner is or should be aware in the exercise of reasonable care that would likely be encountered by the stevedore, that are not known by the stevedore and that would not be obvious to or anticipated by him if reasonably competent in the performance of his work. *Scindia Steam Navigation Company v. DeLos Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981).

3) A shipowner has no duty to anticipate the action or inaction of a careless stevedore. *Polizzi v. M/V Zephyros II Monrovia*, 860 F.2d 147 (5th Cir.1988).

4) The facts in this case do not establish negligence or fault on the part of Scott Chotin, Inc., its agents, or employees in any respect. Specifically, the barge and its equipment were in such condition that an expert and experienced stevedore would be able by the exercise of reasonable care to make the required crossover connection with reasonable safety. Likewise, there were no hidden dangers in the vessels equipment that would likely be encountered by the stevedore that were not known by the stevedore or would not be obvious to or anticipated by him if he were reasonably competent in the performance of his work.

5) The demands of plaintiffs, Alden and Ruth Crochet, and intervenor, Citgo Petroleum Corporation, will be dismissed with prejudice, plaintiffs to pay all costs connected with the main demand, and intervenor to pay all costs connected with its intervention.

The court will render judgment in accordance with the above findings of fact and conclusions of law.

THUS DONE AND SIGNED.